# Court of Appeals.

October 7, 1902.

## THE PEOPLE v. GEORGE A. SMITH.

(172 N. Y. 210.)

1. MURDER—TRIAL—FORMER JEOPARDY—NEW TRIAL.

Where the court, on the trial of defendant for murder, was satisfied that one of the jurors was sick and unable to perform his duty, it was authorized to order him discharged and to then or subsequently impanel another jury to try the indictment, and a plea of former acquittal or conviction could not be properly interposed.

2. SAME—EVIDENCE.

Proof of finding upon the premises of the accused the frame of a revolver, with which it was claimed a murder was committed, and which was partially covered with black grease and emitted a smell of burnt powder from the barrel, together with testimony of the finding of the center pin and of several cartridges containing bullets similar to the one extracted from the head of deceased, is competent, although the cylinder was not found and no direct proof that there was a cylinder in the frame while it was in the possession of the accused.

3. SAME—LAY WITNESS.

The court, upon the cross-examination of a witness for the prosecution who has testified to acts and conversations of the accused subsequent to the homicide, pproperly excluded evidence as to whether the conduct of the accused seemed to the witness to be natural and genuine when the opinion called for is not restricted to any particular act or acts testified to by him, and the witness is not shown to possess any superior knowledge on which to base an opinion.

4. SAME.

The testimony of a nurse as to the appearance, silence and demeanor of a wife when the husband, accused of shooting her, came into the room where she was, as well as a statement concerning her subsequent physical condition and temperature, are inadmissible as a basis from which to draw conjectures as to the wife's belief in the guilt of the husband, whose innocence she had declared, where, at the time, the accused neither made any direct admission nor performed any act which could be regarded as an admission.

5. SAME—SILENCE OF ACCUSED.

A husband accused of the shooting of his wife, where there is no proof that he observed these things is not required to interrogate her as to her change of countenance, as to the reason why she withdrew

her hand, why she did not speak to him, or look at him, or why she turned her head, nor is his silence at the time such an acquiescence in her conduct as to render testimony of her demeanor admissible, where she had persistently declared him to be innocent, was at the time in a semi-conscious and partially paralyzed condition, and he had been cautioned by her attendants to maintain silence and not disturb her.

**6. SAME—KNOWLEDGE OF IMPULSES OF DECEASED.**

It was error for the court to permit a nurse, who attended a wife fatally shot, to state her knowledge of the impulses of the deceased in withdrawing her hand from her accused husband, when such knowledge was based upon the looks of deceased and what she subsequently said, with no proof as to what that statement was.

**7. APPEAL—REVERSIBLE ERROR.**

The erroneous admission in a trial for homicide of evidence as to the silence of the accused while in the presence of the deceased before her death, and as to the demeanor of the latter, constitutes reversible error where the testimony was specially called to the attention of the jury in the charge of the court, and they were told that it might be considered by them in determining the defendant's guilt or innocence.

**8. SAME—ADMISSIONS.**

Statements made by a husband, accused of killing his wife, to a witness, that although the latter had told him that his wife could not speak before her death, yet the witness was reported in a newspaper as having said that the deceased told her that the husband was guilty, do not constitute an admission by the accused of any fact material to the issue and are inadmissible.

**9. SAME.**

Where a witness was improperly permitted to testify as an expert to many material matters when he was obviously incompetent, the error is not cured by striking out all except such portions as bear on specified subjects, where it is difficult if not impossible for the jury to determine what was stricken out and what remained; nor is the error cured by an offer of the court to strike out the entire evidence of the witness and permit him to be recalled when the proper foundation is laid.

**10. SAME—DYING DECLARATIONS.**

The fact that decedent was in actual danger of death may be established by her declarations, the testimony of the attending physicians and the circumstances showing her condition, and that it was realized by her.

**11. SAME.**

It is error for the court to admit proof of the declarations of the decedent relating to occurrences forming no part of the *res gestae* and which took place hours before the tragedy.

APPEAL from a judgment of the Supreme Court, rendered at a Trial Term for the county of Monroe, November 10, 1898, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

George Raines, for appellant.

Stephen J. Warren, for respondent.

MARTIN, J.: On the morning of September 9, 1897, at Churchville, in the county of Monroe, a most horrible tragedy occurred. The victim was the defendant's wife. On the following morning the defendant was arrested and charged with having caused her death. In November, 1897, he was indicted for the crime of murder in the first degree, was subsequently tried, and on November 4, 1898, was convicted of the crime charged. On November tenth he was sentenced to be executed in the manner provided by law. At the time of the homicide the defendant was sixty-three years of age and his wife sixty-one. They had been married forty-three years and had two adult sons who were also married, one living at Churchville and the other at Omaha. The defendant claimed that on the morning of the homicide two burglars entered his house, robbed him of his money and shot his wife because she attempted to give an alarm. Her death was not immediate, but occurred five days later from the effects of a pistol wound in the head inflicted at the time of the tragedy. At that time the occupants of the house were the defendant, his wife, Grant Walker, her nephew, and Miss New, a nurse attending him. Walker and the nurse occupied a bedroom and hall directly over the room where the defendant and his wife slept, but they heard no shot although the nurse was giving medicine on the hour and between hours passed up and down stairs. The defendant and his wife occupied the same bed, having retired about ten o'clock

on the previous night. At twelve o'clock they both arose but soon retired again. Shortly before three o'clock, Dr. Van Horn, a neighbor, heard the report of a pistol in the direction of the defendant's house, but it was heard by no one else. At about three o'clock the nurse was aroused, but what awakened her she was unable to state. Upon awakening she heard groaning, went to her patient, found him sleeping, and then concluded that it was below and that it was the defendant. She did not go to the room where he was until about four o'clock and in the meantime the groaning continued, but she heard no other sound except after three o'clock she heard the shutting of a door which she could not locate. When, finally, she went below, she found the defendant in the dining room fastened with ropes to the leg of an oak dining table, with his legs bound, his hands tied behind him and a gag in his mouth. She asked him if he was sick and he replied, "They bound me, let me loose." She at once summoned the neighbors. Upon her return she went to the bedroom occupied by the defendant and his wife, saw blood on the decedent's face and on the sheets, and asked her what had happened. She did not reply but inquired for the defendant. The neighbors soon reached the house. One of them cut the cords with which the defendant was bound and raised him from the floor, when he at once stated that two masked burglars had entered the room occupied by himself and wife, dragged him from the bed, compelled him to disclose where his money was hidden, which they took, and then bound, gagged and left him in the condition in which he was found. He was partly dressed, having on trousers, a night shirt, a pair of socks and suspenders over his shoulders. The table to which he was fastened was an ordinary dining table, upon which were the dishes ordinarily used for meals. He described the burglars as one being tall, the other short, as wearing white masks and moccasins and as carrying shining revolvers. He also stated that they kicked, pounded and sandbagged him; that he heard the discharge of a

gun in the room then occupied by his wife, who cried "murder," and that that was why they shot her; that after the gun went off the burglars said it went off accidentally; that they then left the house, one of them, at least, going through a window on the south side. A physicion who examined Mrs. Smith found a wound in her ear and powder marks in and around it. Between seven and nine o'clock that morning an officer procured from the defendant a revolver, but it was conceded that it was not the revolver used in the commission of the homicide. Between eight and nine o'clock Mrs. Smith was examined by physicians present, who announced that she would die from her injuries. The defendant was informed of the result of the examination and that his wife desired to see him, to which he replied, " I can't now." Subsequently during that morning the dying statements of Mrs. Smith were taken, which were in substance that she was obliged to get up at about twelve o'clock; the defendant got up at the same time, struck a match and lighted a lamp; before she was hit she saw no one and heard nothing, but felt a hard blow upon the side of her head; no one held a gun to her head and threatened her, and she did not know who hit her. Her statement was not signed except by the witnesses and was rejected at the trial as incompetent, but its substance was proved by witnesses who were present when it was taken. At the time it was made the decedent was in a drowsy stupor or partial coma, and had to be aroused when questions were asked and she answered them only by yes or no. The premises where the homicide occurred were searched by officers, who found pieces of rope and cord which were proved to be similar to those with which the defendant was bound. A revolver frame without a cylinder and also the center pin were found in a building upon the premises, and in the same building were found several cartridges, the bullets in which were proved to be similar to that extracted from the decedent's head. The cylinder belonging to the revolver frame was never discovered, although a most thorough search was

made of the entire locality. Until her death the decedent persistently asserted that she did not know who shot her, but that the defendant did not. She passed through increasing symptoms of stuper until absolute coma set in on the following Monday which resulted in her death in the evening of that day. The defendant asserted that he was seriously injured and that the burglars had struck him in the chest, knocked him down and tied him. He groaned and complained so loudly that he was asked to keep quiet both by the physicians and nurses in attendance. Subsequently the physicians removed his shirt, examined his chest, abdomen and hip where he claimed to have been injured, but no indications of external bruises or injuries were found. Proof was given that there was dust on the window sill that appeared to be undisturbed, which tended to show that no one had passed through the window by which the defendant claimed that at least one of the burglars had escaped. When asked if he made an outcry, he replied, " No, there was no need of doing that." There was also proof that where he said the box that contained his money was hidden there was dust, but that it was undisturbed, thus indicating that his statement in that respect was also untrue. Other proof was given tending to show that different statements made by the defendant were inconsistent, and that his original statement was false. There was some evidence tending to show that the relations between the defendant and his wife had at times been unpleasant, although there was other proof that their relations were most friendly. There were two life insurance policies of one thousand dollars each upon the life of the decedent which had been assigned to the defendant.

On June 13, 1898, the defendant was arraigned, pleaded not guilty, and the trial was commenced and continued until the twenty-eighth day of that month. During that time a jury was selected and considerable evidence was taken in favor of the prosecution. One of the jurors subsequently became ill, on account of which the trial was adjourned from day to day from

June 28th until July 2, 1898, when, upon filing a physician's certificate that the juror could not, without serious risk to his health and life, continue his duties, the court discharged the jury and ordered the trial postponed. The defendant objected to their discharge, demanded the selection of a new juror in place of the one who was ill, and that the trial proceed. The court declined to comply with his demand, and the trial was postponed until the 19th of September, when it was again commenced. On that day, before a jury was called, the defendant claims to have pleaded former trial and jeopardy in bar of any further trial of the indictment against him. This was overruled, the defendant excepted and the trial proceeded. On the 4th of November the defendant was convicted of murder in the first degree, and on the tenth day of the same month a motion for a new trial was made and denied. Upon his alleged plea of jeopardy the defendant also moved in arrest of judgment, which was denied, and the defendant was duly sentenced. The defendant's plea of former trial was based upon or consisted of a written application which set forth the facts in relation to his indictment, his plea of not guilty, the commencement of the trial, its continuance for several days, the illness of a juror, the discharge of the jury by the court on account of such illness, the postponement of the trial, and all the facts attending the action of the court in that respect, and alleged that such postponement was unnecessary, and by reason of the facts thus stated the defendant had been placed in jeopardy of his life and liberty, and could not a second time be placed on trial.

On the trial the People called Emma G. Dabell as a witness, who testified that she was a nurse and attended Mrs. Smith in her last illness; that on Saturday morning about ten o'clock the defendant was at the house, asked to see his wife, went into her room, followed by Mr. Hawley, an officer having him in custody, passed to the east side of the bed near Mrs. Smith's pillow, and that she observed what she did at the time.

The witness was then asked: " What was the first thing you
observed of her ? " This was objected to by the defendant as
incompetent and immaterial. The district attorney then said:
" Not anything that was said ? " to which the court replied:
" If she said anything in his presence it would be competent.
If it was in his presence I think it was competent." The de-
fendant's counsel again objected to this evidence as incom-
petent, immaterial and as partaking of the nature of a dying
declaration, for which no foundation had been laid. Overruled.
Exception. Then followed the question: " What was the first
thing that you observed of Mrs. Smith ? A. As Mr. Smith
passed by me to take a seat, she gave a start. Q. Anything else
that you can describe ? A. Only that she looked at him. Q.
Did you observe her countenance at that time ? A. Yes, sir;
it changed. Q. Go right on; anything else that you observed ?"
The defendant objected to the characterization of the appear-
ance by the witness. Overruled. Exception. " And you
say she looked at him ? A. Yes, sir; and she looked at him,
and Mr. Smith put his hand out on the hand that Mrs. Smith
had lying on the outside of the bed clothes, and she drew it
away, and he sat there and dropped his head and wiped his
face with his handkerchief, and she looked at him and he did
not look at her, and when he again looked up he looked out of
the window, and he sat there for, perhaps, just guessing at the
time, I should think, perhaps it was five or six minutes. Mr.
Hawley said, ' Come, Mr. Smith,' and they got up and went
out. Q. Was there a word spoken between them there ? A.
Not a word." The defendant's counsel then moved to strike
out the occurrence as immaterial, irrelevant and incompetent.
Denied. Exception. This witness likewise testified that she
saw the defendant there again after that on Saturday afternoon
and Monday morning; that he was in company with the same
officer; he came into the room, asked to see his wife, went in
and sat a few minutes by the side of the bed, but said nothing
and wiped off his face with his handkerchief and went out.

Then followed the question: " Now you may describe anything that you observed about Mrs. Smith then, as to what she did?" Objected to as incompetent and immaterial. Overruled. Exception. " Or anything that she didn't do, either one? A. She did not appear to see him. Q. Did she look at him on that occasion? A. No, sir. Q. Did he touch her in any way or say anything to her? A. No, sir. Q. About how long was he in the room then? A. Perhaps three or four minutes." The witness also testified to his being there on Monday morning, and was asked, " Did he speak to Mrs. Smith on that occasion? A. He did not. Q. Did Mrs. Smith speak to him on that occasion? A. No, sir. Q. What was there with reference to her appearance; do you know whether or not she saw him on that occasion?" Objected to by the defendant as incompetent and immaterial. " The Court: She may state whether she looked at him. A. She did not." Upon the cross-examination of this witness she was asked: " You have no way of knowing what the sick woman's impulse came from at the time that she drew her hand towards her, have you? A. Only as I might judge from the expression of her face and what she said to me afterwards." The defendant moved to strike out " what she said to me afterwards." Denied. Exception. On the redirect examination the attention of this witness was called to the first interview, and this question was asked: " Soon after Mr. Smith left that room did you observe any indications of choking or coldness?" This was objected to as incompetent and purely speculative. Overruled. Exception. " Now, then, give us what your recollection is and what was the first thing that indicated to you any such condition?" Objected to as incompetent and immaterial. Overruled. Exception. " Mrs. Smith did not swallow very well and her throat seemed to fill up with mucus. She made an effort to raise the mucus and I assisted her, and then she complained of being cold, and her feet, her extremities were cold. Q. About how long after Mr. Smith had been there on that occasion did you first notice

those things?" Objected to as incompetent, immaterial and speculative. Overruled. Exception. "A. Within an hour. Q. Did Smith shed any tears on that occasion?" Objected to as incompetent and immaterial. Overruled. Exception. "A. He did not."

Sarah Hughes was also called as a witness for the People and testified that she saw the defendant there on Thursday, saw him go into Mrs. Smith's room; Mrs. Smith was lying on her back on the west side of the bed, and that Mr. Townsend had been there at that time and she had heard a statement that had been taken before. She was then asked: "You may just describe Smith's appearance and his going into that room, and what he did and how long he was there, and all about it, in your own way." The defendant's counsel objected to anything being narrated which was made up of Mrs. Smith's acts or demeanor while Smith was in the room, anything of any statement on that subject in reply to this question. "The Court: I am inclined to think that anything that was said between these parties, as to the homicide or the shooting, is competent." Exception. "I object to her acts and demeanor, and I take a separate objection to what she said. The Court: This is not received for the purpose of establishing her dying declarations, but as against him, anything that may have been done or said at that time." Exception. "A. He entered the room from the parlor with his handkerchief over his face, went to the side of the bed and stooped over Mrs. Smith, putting his hands one on each side of her as she lay on the bed, and put his cheek down near hers; he raised his head and spoke to her- and she replied; he raised himself to an erect position, turned around and left the room. Q. What was her act?" The defendant objected as incompetent and on same grounds as to the previous question to her acts. "The Court: Describe nothing that took place when he left, but what she did in his presence." Exception. "The Court: Was this while he was looking at her? A. Yes, sir. The Court: She may state what she did and

said, if anything, in his presence." Exception. "A. She turned her face away from him. . . . Q. Just illustrate to the jury the motion of her face at that time or her head at that time?" The question and her acts were objected to as incompetent. "The Court: State what he said, if anything, and what she said and what she did." Exception. "A. She turned her face on the pillow away from him, like that." The witness was also permitted to testify under the defendant's objection and exception that he said about six words and that he was there not to exceed a minute from the time he entered the bedroom until he went out. She did not hear the words that passed between them, except that when the defendant came into the room he said, "My wife, my wife!"

At the close of the evidence the defendant again moved to strike out the evidence of the witness Dabell with regard to the acts and demeanor of Mrs. Smith and also the evidence of the witness Hughes to the same effect. These motions were each denied and the defendant again moved to strike out the parts of that evidence which related to the acts and demeanor of Mrs. Smith and limited his motion to that part of the transaction. To the denial of each of these motions separate exceptions were taken.

The witness Emily Bugbee was permitted, under the objection and exception of the defendant, to testify to a conversation with him as follows: "What did he say? A. He said, 'Don't you remember you told me she couldn't speak, she couldn't talk,' and he said, 'I see by the newspaper that you said she told you that I did it.'" This was objected to by the defendant as incompetent, immaterial and irrelevant. Overruled. Exception. The witness then continued: "He says, 'You must have misunderstood her. She must have been calling for me, for George,' saying, 'Where is George?'" That a part of the conversation which occurred at this time was admissible is not denied, but it was to the portion above

quoted that the defendant objected, and upon his exceptions to its admission he now relies.

A careful reading of the evidence has satisfied us that it was sufficient to authorize the submission of the case to the jury and to justify its verdict. We are not satisfied that the verdict was so far against the weight of evidence or against law as to justify us in granting a new trial unless the exceptions of the defendant require it. Therefore, the only questions that need be considered upon this appeal are those presented by such exceptions.

First. The appellant contends that the court erred in deciding his alleged plea of former jeopardy without submitting it to a jury, and in denying his motions based thereon for a new trial and in arrest of judgment. The facts upon which these applications were founded were obviously conceded, and the court denied them upon the ground that, as a matter of law, the facts were insufficient to sustain such applications or to prevent a further trial of the indictment. If the alleged plea appeared on its face to be wholly insufficient, the question of former jeopardy was not required to be submitted to the jury. (Abbott's Trial Brief [Crim.], sec. 127.) The validity of the appellant's exceptions to these rulings must be determined in the light of the provisions of the Code of Criminal Procedure, as that act applies to all criminal actions and other proceedings in criminal cases from the time when it went into effect. (Code Crim. Pro., sec. 962.) Its provisions, so far as applicable to the question under consideration, are to the effect that no person shall be subjected to a second prosecution for a crime for which he has been duly convicted or acquitted; that a plea of former conviction or acquittal may be pleaded either with or without the plea of not guilty by the defendant's alleging " that he has already been convicted (or acquitted, as the case may be), of the crime charged in this indictment, by the judgment of the court," naming it and naming the place and date of such conviction. It also provides that issues of

fact shall be submitted to a jury; that questions of law shall be decided by the court, and expressly provides that " If, before the conclusion of the trial, a juror becomes sick, so as to be unable to perform his duty, the court may order him to be discharged and another jury to be then or afterwards impaneled." (Secs. 9, 332, 334, subds. 4, 355, 416, 417.) It is obvious that under these provisions of the statute, upon being satisfied that one of the jurors was sick and unable to perform his duty, the trial court was authorized to order him discharged and to then or subsequently impanel another jury to try the indictment herein. The sickness of one of the jurors originally impaneled was the sole ground upon which the jury was discharged and the trial postponed. Under these circumstances, a plea of former acquittal or conviction could not be properly interposed. A former conviction or acquittal which may be pleaded in bar is a conviction or acquittal on the merits. (Canter v. People, 1 Abb. Ct. App. Dec. 305, 308; 2 R. S. 701, secs. 24, 25; Code Crim. Pro., secs. 340, 341.)

Moreover, the alleged plea in this case was not in form or in substance as required by the Code. (Secs. 332, 334, subd. 4.) It contained no allegations either of a former conviction or of a former acquittal, and, consequently, under the requirements of the Code, no issue of fact was presented for the determination of a jury. (People v. Cignarale, 110 N. Y. 23, 29.) If the application of the defendant properly presented any question for determination by either the court or the jury, it was plainly a question of law which the court was required to decide. (Code, sec. 417.) It could not be said that the defendant had been put in jeopardy as he had not been tried, and no jury had passed upon the merits of the case. (People v. Barrett and Ward, 1 Johns. 66, 69; People v. Goodwin, 18 Johns. 187, 203; People v. Reagle, 60 Barb. 527, 544.) It has long been a part of our established jurisprudence that where a trial, before a verdict is rendered, is terminated by an order of the court either on account of the illness of a juror or for

any other sufficient cause, a new jury may be impaneled and the indictment tried, and a former partial trial thus terminated constitutes neither a conviction nor an acquittal. (People v. Casborus, 13 Johns. 351; People v. Green, 13 Wend. 57; People v. Olcott, 2 Johns. Cases, 301, 306; People v. Cignarale, 110 N. Y. 23; Commonwealth v. McCormick, 130 Mass. 61, 62.) We are, therefore, of the opinion that the court properly disposed of the defendant's applications and motions, and that its rulings in that respect constituted no error.

Second. The defendant also contends that the court erred in admitting proof of the finding of the revolver frame, that it was partially covered with black grease and emitted a smell of burning powder from the barrel, the finding of the center pin and of several cartridges on the defendant's premises containing bullets similar to the one extracted from the decedent's head, and upon the proof and the circumstances connected therewith in submitting to the jury whether they were portions of the revolver with which the crime was committed, although the cylinder was never found and there was no direct proof that there was a cylinder in the frame while it was in the possession of the defendant. We do not think this contention can be upheld. Although to prove a fact by circumstances the circumstances themselves must be established by direct proof and not left to inference, yet it does not follow that all the circumstances which were established upon the trial by direct evidence, from which it might be inferred that the defendant employed the portions of the revolver found in the commission of the offense with which he was charged, should have been entirely disregarded and withdrawn from the consideration of the jury, simply because the cylinder was not found, especially in view of the other proof in the case and of the fact that the account which the defendant gave as to the revolver and other matters relating to the homicide was shown to have been exceedingly improbable if not absolutely untrue. The absence of that proof merely affected its potency and the weight which

was to be given to it by the jury, but did not reach the question of its competency. (People v. Neufeld, 165 N. Y. 43, 47; People v. Wennerholm, 166 N. Y. 567, 573; Greenfield v. People, 85 N. Y. 75, 82.)

Third. A witness for the prosecution testified to some of the acts and conversations of the defendant under certain conditions which arose subsequently to the homicide. Upon her cross-examination she stated that she could not remember the details of the conversation to which her attention was called, whereupon the defendant's counsel asked the following question: " At the time did his conduct seem to you to be natural and genuine?" This was objected to, the objection was sustained, and the defendant excepted. He now insists that the court erred in sustaining that objection. It may be that upon cross-examination the court might, in its discretion, have permitted the witness to answer, but was it required to do so is the question here presented. Obviously the witness was not an expert or introduced as such, so that the broad question is whether a lay witness, after partially describing the acts and conversations of a party, must be permitted to testify whether or not his conduct seemed to the witness to be natural and genuine. There may be instances where the circumstances are peculiar and such that a lay witness may be permitted to testify that in his opinion certain described acts seemed natural or otherwise, if that is the only manner in which the fact can be proved or determined and it depends upon a variety of circumstances or a combination of minute appearances, impossible to describe, so that a jury would be able to decide the question. Obviously no such question was presented by the ruling under consideration. The question objected to and excluded did not call for an opinion as to whether any specified act or acts were natural or otherwise, but whether the general conduct of the defendant at the time, without any limitation to the acts or conversations proved, was assumed or genuine, natural or unnatural. No such question would be allowed even upon

an issue of imbecility, idiocy or insanity, where the rule has been extended to its fullest limit. Moreover, the witness was not shown to be competent to give an opinion upon that question. There was no evidence showing that she possessed any superior knowledge by reason of which she could have judged of the character of his acts any more correctly than the jury, so that under the circumstances the question in effect called for the conjecture of the witness rather than for her opinion based upon any knowledge she was shown to have possessed. Whether he was simulating pain or feigning sorrow was not a fact as to which she could testify. She was not shown to have had any previous knowledge of his habits or disposition which rendered her competent to give an opinion upon that subject. If she had been interrogated as to his usual manner, his disposition, nervousness, excitability, whether demonstrative under great or slight provocation, his mode of expression when excited, whether extravagant or otherwise, so far as they had been observed by her, all the facts within her knowledge bearing upon the question would have been placed before the jury that could have been competently established by her. The question whether at that time the general conduct of the defendant was natural and genuine did not call for proof of any fact within her knowledge or of which she was shown competent to speak. Whether his conduct was natural and genuine could be determined only by a person who had known the defendant with sufficient intimacy to become familiarly acquainted with his natural acts and conduct, and it then involved a comparison of his conduct at the time with that which the witness had formerly observed. This witness was not shown to possess any such familiarity as to render her competent to answer the question, even if it was otherwise admissible. If she had been qualified and the question had been whether some particular act testified to by her impressed her as natural or otherwise, quite another question would have been presented. The general rule is that a witness must state facts and not

opinions. To this rule there are certain exceptions. But the question asked by the defendant's counsel does not fall within any of those exceptions. Even in cases where the question of mental soundness or insanity is involved, a lay witness cannot properly give an opinion as to the mental capacity of the person, but at most can give an impression as to whether the acts observed by him were rational or irrational. (People v. Rector, 19 Wend. 569, 574; People v. Bodine, 1 Denio, 281, 311; Kennedy v. People, 39 N. Y. 245, 257; Messner v. People, 45 N. Y. 1, 4; Van Zandt v. Mut. Ben. L. Ins. Co., 55 N. Y. 169, 179; People v. Wright, 136 N. Y. 625, 629.) Without further discussion of this question, we are of the opinion that the court properly excluded this evidence, and that there was no error in its rulings in that respect.

Fourth. The appellant also claims that the court erred in admitting the testimony of the witnesses Dabell and Hughes under his objections and exceptions as to the appearance, silence, acts, movements, demeanor, temperature and physical condition of the decedent, what she did and what she did not do while in the presence of the defendant, although he said nothing and performed no act which in any way tended to inculpate him by admission or otherwise. By these rulings the court, in purpose and effect, admitted proof to establish the imagined or conjectured impulses of the decedent, as evinced by her looks, her change of countenance, and by her subsequent unproved declarations, as well as the condition and temperature of her body after a meeting between her and the defendant. It also admitted the evidence of the witness Emily Bugbee of the alleged statements of the defendant, not amounting to or including an admission of any fact relating to the homicide, but which related only to a mere newspaper report, apparently inspired by the witness, to the effect that, although she had informed the defendant that the decedent could not talk, she had said to a newspaper reporter that the decedent had declared that he (the defendant) did it, and to which he added that she

must have been mistaken as his wife must have been calling for him. We are aware of no rule of evidence under which this proof was properly admissible. The learned trial judge was obviously of the opinion that the presence of the defendant rendered proof of everything that occurred or did not occur absolutely admissible, without regard to its character, by whom it was said, done or omitted, or to the circumstances or conditions under which the acts or omissions of the decedent or of the defendant occurred. In that, we think, he was in error. The practical effect of his rulings was to allow the prosecution to place before the jury the observed or imagined condition, appearance, movements, conduct and demeanor of the decedent from which to conjecture a mental condition of which there was not only no valid proof, but which, when proved, had no proper bearing upon the questions at issue. The possible and intended, if not the probable and natural effect of that evidence was to induce the jury, notwithstanding her positive denial, to believe that the decedent was of the opinion that the defendant committed the offense of which he was charged. The issue was not what the decedent may have thought or believed, but whether the defendant committed the offense. This evidence was inadmissible, not only because it was an attempt to prove a mere unsubstantiated conjecture as to a matter of which neither the witness nor the jury had any knowledge, but also for the reason that the decedent's belief was wholly incompetent and immaterial. That during the occurrences to which this evidence related the defendant made any actual admission, direct or indirect, of any fact material to the issue, cannot be even pretended. Nor did he perform any act that could be regarded as an admission of any such fact, unless his silence constituted such an admission.

The only possible ground upon which the silence of a party can be admitted as evidence against him is that it amounts to an acquiescence in a statement or act of another person. The

rule admitting such evidence is to be applied with careful discrimination. Such evidence is most dangerous and should be received with great caution, and not admitted unless of statements or acts which naturally call for contradiction, or unless it consists of some assertion with respect to his rights in which, by silence, the party plainly acquiesces. To have that effect, his acquiescence must be exhibited by some act of voluntary demeanor or conduct. If the claimed acquiescence is in the conduct or language of another, it must plainly appear that such conduct or language was fully known and fully understood by the party before any inference can be drawn from his passiveness or silence. The circumstances must not only be such as to afford him an opportunity to act or speak, but such as would ordinarily and naturally call for some action or reply from persons similarly situated. If the condition be one of doubt as to whether a reply should have been made, the evidence should not be received. Declarations or acts made or performed in the presence of a party, when received in evidence, are received not as evidence in themselves, but in a proper case and under proper circumstances and conditions they may be admitted to ascertain what the party to be affected said or did, but he is not to be prejudiced by the statements or acts of another in his presence, although silent, unless the statements or acts are such as to call for some response or act upon his part. (People v. Koerner, 154 N. Y. 355, 374; Lanergan v. People, 39 N. Y. 39; Kelley v. People, 55 N. Y. 565, 572; People v. Willett, 92 N. Y. 29; Wright v. People, 1 N. Y. Crim. Rep. 462.)

Thus the question is presented whether, under the circumstances existing at each of the defendant's visits to the bedside of his wife, of which evidence of his silence was given, it can be properly held that he thereby acquiesced in any act or acts of the decedent which had any prohibitive bearing upon the issue. Thus we are led to inquire in what can it be properly said that he acquiesced? Nothing was said to which any reply

could have been made.    Nor do we think there was any act of the decedent which, under the circumstances proved, demanded action or remark upon the part of the defendant to avoid acquiescence therein.    What should he have done? With no proof that the defendant observed these things, was he required to interrogate her as to her change of countenance, as to the reason why she withdrew her hand, why she did not speak to him, or look at him, or why she turned her head, or be bound by the conjecture of a jury as to what impelled such acts upon her part, although, under the proof, they may have been wholly involuntary?   We think not.   She being at most only semi-conscious, he was not required to, nor could he properly, speak of or criticise her conduct, even if it was as testified to and was observed by him.    But there was no proof that he observed any peculiar action or conduct upon her part, or anything in the nature of an accusation by her.    In view of the fact that she persistently declared him to be innocent, naturally he would not anticipate or observe an accusation in anything that she was proved to have done or omitted.   It is also to be remembered that the defendant had been frequently enjoined by the physicians and nurses in attendance to maintain silence, and not to disturb the decedent when in her presence; that the decedent, when approached by her physicians or nurses and her wrist was touched, would not only make a convulsive movement of her hand, but would turn over on her left side with her face to the opposite wall; that she was partially paralyzed, and, as a consequence, her speech was essentially impaired and difficult to understand; that her face was thereby distorted, and that the defendant was upon each of the occasions when he visited her room in the immediate custody of an officer who controlled his coming and departure.   In view of the fatal illness of his wife and of the positive injunctions of silence by her physicians and nurses, his omission to speak in her presence certainly could not be properly regarded as an acquiescence by him in anything she was proved to have done or omitted.

Moreover, he was at the time under arrest and in the custody of an officer, and might well have been silent without its being regarded as an acquiescence in any act proved to have been performed.    (Commonwealth v. McDermott, 123 Mass. 440; State v. Diskin, 44 Am. Rep. 449.)    We think the court erred in admitting much of this evidence, and also in permitting the witness Dabell to state her knowledge of the impulses of the decedent when she withdrew her hand, from her looks and from what she subsequently said, with no proof as to what that statement was.    The only remaining question in respect to those rulings is whether they constituted such errors as require a reversal.    Had that evidence been casually or incidentally admitted, and no particular force or effect given to it by the court or jury, we might perhaps be justified, under section 542 of the Code of Criminal Procedure, in disregarding the errors in its admission as  not having affected the substantial rights of the defendant.    But that is not the situation.    In submitting the case to the jury the learned trial judge not only instructed them that they might consider the dying declarations of the decedent, but in effect charged that they might disregard her statement that the offense was not committed by her husband.    Upon that question the jury were told that they might consider the action and conduct of the defendant in the presence of his wife.    Their attention was also expressly called to the testimony of the witnesses Dabell and Hughes, and they were informed that they had the right to draw such inferences from his acts and conduct upon those occasions as they thought proper.    That portion of the charge which submitted to the jury the question whether the decedent knew who committed the crime when she was asked if George did it was excepted to by the defendant.    The court then said: "That is a question for you, gentlemen." Thus the court submitted to the jury the question whether Mrs. Smith knew that the defendant committed the homicide.    Her knowledge was unimportant as bearing upon the main issue, and, hence, for that purpose proof

of it was inadmissible. Moreover, it is obvious that the evidence submitted to the jury, upon which they were instructed that they might find that she knew that her husband did it, was improperly received. The defendant also expressly excepted to the charge as to the incidents testified to by the witnesses Hughes and Dabell relating to the moving of the hand and the turning of the head as well as to the submission of that question to the jury. From these rulings and exceptions and what transpired when they were made and taken it is obvious that the court plainly and intentionally instructed the jury that this evidence was proper and should be considered by them in determining the defendant's guilt or innocence. Under these circumstances, in view of the prominence and importance which was given to that evidence, it is impossible to say that its admission did not affect the substantial rights of the defendant.

The only other evidence submitted to the jury upon the question whether the decedent truthfully stated that the offense was not committed by the defendant was that of the witness Emily Bugbee, which consisted of the defendant's statement as to what the witness had said and what had subsequently appeared in a newspaper. In that conversation, so far as it related to that subject, there was no admission of confession by the defendant of any fact material to the issue. The only admissions that could be possibly spelled out of that evidence were that Mrs. Bugbee had told him that the decedent could not talk and that an article was published in a newspaper to the effect that the witness had said that Mrs. Smith had declared that the defendant did it. The remainder was the mere statement of an incident which not only had no bearing upon the issue, but was mere hearsay. The declarations of a party that he had heard or read certain statements cannot be given in evidence against him to establish such statements, because they are at most hearsay, and when stated by him as such it does not change their nature, but they continue to be hearsay and are, consequently, inadmissible. All the defendant said as to the newspaper ac-

count was that it contained a statement to the effect that the witness had said that the decedent declared that the defendant did it. This was not an admission that he did it, or of the truth of any of the matters thus stated. (Stephens v. Vroman, 16 N. Y. 381; Reed v. McCord, 160 N. Y. 330, 341.)

While it was competent to prove that the defendant, when in the presence of his wife, did not look at her or that he shed no tears, still that was not the object, nature or limit of the proof objected to, as is manifest from the character of the examination, the nature of the exceptions and rulings, and from the evidence thus received. The proof objected to related entirely to the appearance, acts, looks, movements, temperature, demeanor and physical condition of the decedent when the defendant was absent, what she did and omitted to do in his presence, and his silence. By this proof and by evidence that she said something to the witness Dabell that, together with her looks, led her to know the impulse of the decedent, the defendant was sought to be bound by his silence, not only as to what the decedent did or did not do, but also by some impulse she might he supposed to have possessed, by hearsay evidence and by the conclusion of a witness based upon her unproved declarations. It is manifest that many of the rulings admitting this evidence were erroneous, and, in view of the charge of the learned judge, it cannot be said that they did not affect the defendant's substantial rights.

Fifth. Another class of exceptions argued by the appellant relates to the admission of the evidence of the witness Albert L. Hall, who testified as an alleged expert as to the manufacture, uses and differences of pistols and cartridges, the chemistry of burned powder and other substances, and to receiving the speculative opinion of the witness, which was incompetent and subsequently stricken out by the court of its own motion, without consent or objection. The court was occupied several days in taking the evidence of this witness, to which there were numerous objections and exceptions that were obviously valid.

It is impossible, within the limits of this opinion, to consider
in detail all the items of his evidence that were received by the
court under the defendant's objections and exceptions, or to
state accurately each portion of his testimony which is claimed
to have been stricken out. That this witness was improperly
permitted to testify as an expert to many matters material to
the investigation, when he was obviously incompetent, can
hardly be denied. This was recognized by the trial court, and
it subsequently attempted to cure the errors in its admission
by striking out the portions of the evidence that were impro-
perly received. It is obvious from the record that the court
struck out portions of the improper evidence which were speci-
fically stated, and followed this action by a general statement
to the effect that all the testimony of that witness, except that
pertaining to his experiments with powder after revolvers had
been discharged and with reference to the appearance and con-
dition of the fatal bullet, was stricken out and the jury directed
to disregard it. Subsequently other portions of his testimony
were directed to be stricken out. The court likewise stated
that it would direct all exhibits introduced on the examination
of the witness to be stricken out if there was any question about
them, but that they were actually stricken out does not appear.
It may be fairly said that it is difficult, if not impossible, to
ascertain even from the record with any degree of accuracy the
particular portions of the evidence of this witness which the
court attempted to withhold from the consideration of the jury.
This difficulty arises from the fact that it is hardly possible
to determine what evidence pertained to his experiments with
powder after revolvers had been discharged; what pertained
to his testimony with reference to the appearance and condi-
tion of the fatal bullet, to separate it from the other evidence
which was given by him, or to ascertain what particular por-
tion of the remaining evidence was subsequently withdrawn.
The evidence which was competent and that which was incom-
petent was so intermingled and woven together as to render it

difficult to separate one from the other, and it must have been almost, if not quite, impossible for the jury under the rulings of the court to understand what portion of this evidence was to be disregarded and what portion it was to consider. It is true that the court stated to the counsel for the defendant that if he desired all the evidence of this witness might be stricken out, and when the foundation was properly laid the witness might be recalled. To this, however, counsel did not assent, but stated that he had all the harm of the evidence and did not know any way to correct it except partially by cross-examination, but that if the witness was not coming back and the evidence was to go out for good on the basis that it was too speculative and uncertain to be the foundation of any conclusion, it would help. Thus it is seen that only a portion of the evidence of the witness was withdrawn from the consideration of the jury; that it was difficult, if not impossible, for the jury to determine what was stricken out and what remained, and, hence, the question presented is whether under those circumstances the error in admitting this evidence was so far cured that it should be disregarded upon this appeal. It seems to be settled by the decisions of this court that if evidence is improperly admitted, the mistake is immediately discovered and the evidence promptly withdrawn with instructions to the jury to disregard it, or if it is stricken out on the motion or application of the appellant, the error will be deemed cured or waived and the exception to its admission deprived of its potency. (Gall v. Gall, 114 N. Y. 109; Holmes v. Moffat, 120 N. Y. 159; People v. Schooley, 149 N. Y. 99, 103; Cole v. Fall Brook Coal Co., 159 N. Y. 59, 65; People v. Priori, 164 N. Y. 459, 469.)

In the case at bar, although the court, when the first portion of this evidence was stricken out, stated that the jury should disregard it, we have not found that such a direction accompanied each instance where such an order was made, or that the

jury were directed in the charge of the court to disregard any part of it.

The theory of the decisions to the effect that errors in receiving improper evidence may be cured when the jury are clearly and plainly instructed to disregard certain specified evidence so erroneously and recently received and the evidence is promptly stricken out, is based upon the presumption that the instructions of the court were obeyed.    The circumstances under which that rule has generally been applied were widely and essentially different from those in the case at bar.    Here, many days had been employed in taking the testimony of this witness and many pages of evidence had been given by him, which was so interwoven as to render it extremely difficult under the rulings of the court for a jury to understand or determine what portion of the evidence remained in the case which they were to consider and what portion they were instructed to disregard.    Under such circumstances it would indeed be very extraordinary to presume that the jury in this case literally obeyed the instructions of the court, no matter how much they may have intended to do so.    In the recent case of Ives v. Ellis (169 N. Y. 85, 90), incompetent evidence was received, the court at the time remarking, " I shall instruct the jury that the letter and the statements in the letter do not in any wise prove the statements therein contained, or any of them."    Upon appeal to this court it was held that the admission of the evidence was error, that the error was not cured by the statements made by the court when it was admitted, and it was said:  " For an appellate court to sustain a ruling admitting incompetent, but, to lay minds, persuasive evidence, because before its reading the court states that the evidence does not in any wise prove the statements therein contained, would not only be unprecedented, but would be mischievous in its tendency."    It was there claimed that the error was subsequently cured by the trial court, which, in the course of its charge, cautioned the jury to entirely disregard the evidence

which was thus erroneously admitted. In discussing that question this court added: " But before an appellate court will hold that such an error has been cured, it must feel sure that the effort of the trial court to correct the error was necessarily effective with the minds of the jury. Now that cannot be said of the caution of the court in this instance, for it must be borne in mind that this letter was introduced in the early part of the trial, which was not only a long one, but in its progress there was an adjournment for a period of ten days, during which the jurors presumably had their minds occupied with affairs of their own; and in view of that situation it was necessary that the court should so accurately describe the letter which it wished them to disregard as to make it apparent that there could be no confusion in their minds as to what letter was referred to." We think the principle of that decision is applicable to and decisive of this case. Here the objectionable evidence occupied a number of days in its admission and related to a variety of subjects. It was not all stricken out. Nor was the portion stricken out, stricken out at one time, but upon several occasions with no clear statement of the particular part of the evidence thus eliminated, and this occurred many days before the conclusion of the trial. It was upon the court's own motion and not upon the application of the defendant. Hence, in view of all these circumstances, it seems quite impossible to say that the error was waived or that the court so accurately described the evidence to be disregarded, or that its directions were at a time when they would be so firmly impressed upon the minds of the jury as to justify us in holding that there was a presumption that the jury obeyed the suggestions of the court, and the error in its admission was cured.

But it is said that the court offered to strike out the entire evidence of the witness and permit him to be recalled when the proper foundation was laid. While this is true, we think it did not affect the error in the previous rulings of the court,

especially as the evidence was not stricken out.    We think
these exceptions fall within the principle of the decision in
Furst v. Second Ave. R. R. Co. (72 N. Y. 542).    In that
case the court received incompetent evidence.    The plaintiff's
counsel proposed to have it stricken out.    The defendant's
counsel declined to accept the proposition and elected to retain
his exception.    The court made no ruling and gave no instruc-
tions upon the subject.    It was there held that the counsel had
the right to insist upon his exception, was not bound to waive
it, and that the error was not cured by an offer to strike out.
We are of the opinion that the court committed several errors
in the admission of the evidence of the witness Hall, and that
they were not cured by any direction of the court contained in
the record.

Sixth. The only other exception we deem it necessary to
specially consider relates to the admission of proof of the
dying declarations of the decedent.    In a case of homicide,
the declarations of the deceased person as to the cause of his
death or as to the circumstances of the particular transaction
which resulted in his death, are admissible, but only when it
is shown to the satisfaction of the judge that the decedent was
in actual danger of death and had given up all hope of recovery
at the time when the declarations were made.    But such decla-
rations are not competent evidence of prior or subsequent occur-
rences, nor of matters of opinion.    The only questions we need
consider in relation to the admissibility of this evidence are:
1. Whether the preliminary proof that the declarations of the
decedent were made under a sense of impending death, was
sufficient to justify the court in admitting them in evidence;
and, 2. Whether the transactions which occurred several hours
before the homicide could be properly proved by that species
of evidence.    As we have already seen, in order to render her
declarations admissible, it was necessary to show that they
were made by the decedent at a time when she was in actual
danger of death, and that she had no hope of recovery.    An

examination of the evidence taken upon this preliminary question renders it evident that it was sufficient to justify the court in its conclusion that they were made by the decedent under a sense of impending death. This was established by her declarations, the testimony of the attending physicians, and the circumstances showing her condition, and that it was realized by her.

The more serious question, however, is whether the declarations of the decedent were properly admitted as to what transpired before the time of the homicide. The record plainly discloses that the proof of the dying declarations of the decedent in which it was stated that she said, "I guess I got up first; I heard him strike a match; it was about twelve o'clock, and I got into bed first," all related not to the transaction which took place at the time of the tragedy or to the homicide, but to a disconnected transaction which occurred about three hours before the fatal injuries were received by her. As to her statements in this respect, there is some variance in the proof. But without considering any discrepancies in the evidence, it is obvious that the greater portion of the dying declarations of which proof was admitted referred, not to the homicide, but to an occurrence which took place hours before. Manifestly, that occurrence formed no part of the *res gestae,* but was an independent transaction, not shown to have had any connection with the crime, and the declarations of the decedent in relation thereto were a mere narrative of past occurrences and not a part of the act which resulted in her death. (Waldele v. N. Y. C. & H. R. R. R. Co., 95 N. Y. 274; People v. Driscoll, 107 N. Y. 414, 424; Martin v. N. Y., N. H. & H. R. R. Co., 103 N. Y. 626.) It seems to be well settled that dying declarations are admissible in cases of homicide only when the death of the decedent is the subject of the charge, and the circumstances of the death are the subject of the declarations, and that they may not properly include narratives of past occurrences. (People v. Davis, 56 N. Y. 95; Eighmy v.

People, 79 N. Y. 546, 559; People v. Shaw, 63 N. Y. 36; Greenfield v. People, 85 N. Y. 75, 88; 1 Greenleaf on Evidence, sec. 156; 1 Taylor on Evidence, 655.; Chase's Stephen's Law of Evidence, 86, art. 26.)

It is, therefore, manifest that under the rules of law governing the admission of dying declarations, the trial court erred in admitting proof of the declarations of the decedent as to what occurred previous to the homicide.

It is a well-established principle of criminal law that the rejection of competent and material evidence, or the reception of incompetent and improper evidence, which is harmful to a defendant and excepted to, presents error requiring a reversal. Such a ruling affects a substantial right of the defendant, even though the appellate court would, with the rejected evidence before it, or with the improper evidence excluded still come to the same conclusion reached by the jury. The defendant has the right to insist that material and legal evidence offered by him should be received and submitted to the jury, and to have illegal and improper evidence, which may be harmful, excluded, and to have the opinion of the jury upon proper evidence admitted in the case, and upon such evidence alone. (People v. Greenwall, 108 N. Y. 296; People v. Wood, 126 N. Y. 249; People v. Corey, 148 N. Y. 476, 494; People v. Koerner, 154 N. Y. 355, 376.) The burden of showing that the illegal and improper evidence which was received was harmful is not upon the appellant, but that it was harmless and could by no possibility have prejudiced him must be established by the respondent. (Greene v. White, 37 N. Y. 405, 407; Stokes v. People, 53 N. Y. 164; People v. Corey, 148 N. Y. 476, 494; People v. Strait, 154 N. Y. 165, 171; People v. Helmer, 154 N. Y. 596, 602.)

We are of the opinion that much of the evidence received by the court under the defendant's objections and the exceptions which we have already discussed, was incompetent and improper, and as such rulings cannot be properly held to have

been harmless, it follows that the judgment must be reversed.

Numerous other questions are presented by the exceptions of the defendant, were discussed upon the argument and in the briefs of the respective counsel, but the fact that the judgment must be reversed for the errors already pointed out, and inasmuch as this opinion has already exceeded the bounds to which it should be limited, it becomes necessary to omit any further or special discussion of the other questions thus presented.

The judgment should be reversed and a new trial ordered.

PARKER, Ch. J., O'BRIEN, BARTLETT, VANN, CULLEN and WERNER, JJ., concur.

Judgment of conviction reversed and new trial ordered.