## COURT OF APPEALS,
### June, 1906.

# THE PEOPLE *v.* RAFFAELE CASCONE.

### (185 N. Y. 317.)

(1). HOMICIDE—EVIDENCE—DECLARATIONS MADE IN PRESENCE OF AC-CUSED—LEGITIMATE USE.

Evidence upon a trial for murder to the effect that the deceased while conscious, but, from the nature of the wound inflicted upon him by the defendant, unable to talk, was asked in the presence of the defendant " if he knew the man who shot him," in response to which he nodded his head, and upon being asked to write the name of the man, wrote that of the defendant, can only be legitimately used to show the effect of the accusation upon the defendant, it being erroneous for the prosecuting counsel, in summing up, to use such statements as dying declarations and found an argument thereon as testimony of the deceased.

(2). ERRONEOUS ADMISSION IN EVIDENCE OF WRITTEN DECLARATIONS MADE IN PRESENCE OF ACCUSED.

The reception in evidence of a writing made by the deceased, in the presence of the defendant, in response to a question in Italian, purporting to ask why the defendant shot him, which when translated by one who understood the peculiar dialect was said to mean " because of a quarrel with my brother," constitutes reversible error where what was said in Italian to the deceased, which led him to write what he did, was not shown, and even if the defendant understood what was written he was not shown to have known what was said that led to the writing, since such evidence is only admissible to show what the defendant did or said when confronted with an accusation.

(3). DECLARATIONS RENDERED INCOMPETENT AS EVIDENCE WHERE DE-FENDANT HAS BEEN DEPRIVED OF RIGHT TO ANSWER.

Evidence that the defendant having subsequently by direction of the coroner been brought before the deceased, who in answer to the question " Is this the man who shot you," nodded his head, is rendered incompetent where the defendant on starting to speak in Italian was told not to and hurried away, thus depriving him of the right to answer the charge made, the sole purpose for which such evidence can be received being to learn the answer of the defendant to an actual or implied accusation.

(4). EVIDENCE TENDING TO DEGRADE DEFENDANT—WHEN INCOMPETENT.

Testimony of a witness on a trial for murder to the effect that the defendant compelled her and another to live as harlots and that his wife received the proceeds of their infamy is incompetent and its reception in evidence is not justified by the fact that the defendant on cross-examination of the witness had sworn that she was then living in meretricious relations.

(5). CROSS-EXAMINATION OF DEFENDANT AS TO PREVIOUS INDICTMENT AND TRIAL—WHEN IMPROPER.

The fact that the defendant had testified in response to a question of his counsel, asked him in order to fix a certain date, that he had had some trouble a few years before, does not justify the prosecuting counsel asking on cross-examination questions as to whether the trouble mentioned was not an indictment and trial for murder, since, it not appearing that the defendant had been convicted, the indictment was merely an accusation and no evidence of guilt and the trial followed by acquittal was but an accusation successfully met, which did not tend to discredit the witness and was incompetent for that purpose

(6). PROSECUTING OFFICERS—REMONSTRANCE AGAINST UNWISE AND UNPROFESSIONAL ZEAL IN SECURING CONVICTIONS.

The review of the case and evidence is closed with the remark, made as a deliberate remonstrance against the necessity for frequent reversals in criminal cases, that too many prosecuting officers run dangerous, foolish and unprofessional risks in order to secure a conviction.

APPEAL from a judgment of the Court of General Sessions of the Peace in the city of New York, rendered October 28, 1903, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*James W. Osborne, Francis I. Osborne, William D. Reed* and *Eugene L. Parodi* for appellant. The writings of the deceased in the Hudson Street Hospital were incompetent and prejudicial to the defendant. They were improperly admitted under objection and exception. (*People* v. *Smith,* 172

N. Y. 210.) All that transpired at the bedside of the dying man in the presence of the coroner, the policeman and the defendant on the day after the crime, being in the nature of a judicial proceeding and the defendant having been stopped from making a reply, was improperly admitted in evidence. (*People v. Kennedy,* 164 N. Y. 449; *People v. Mondon,* 103 N. Y. 211; *People v. Molineux,* 168 N. Y. 264; *People v. Haines,* 6 N. Y. Cr. Rep. 103; *People v. Willett,* 92 N. Y. 32.) It was not shown that the defendant comprehended the questions asked of Sinischalchi at the Hudson Street Hospital or before the coroner, and, therefore, the evidence as to these occurrences was improperly admitted. (*People v. Koerner,* 154 N. Y. 355.) The admission of evidence of a former trial for murder in Brooklyn, upon which the defendant was tried and acquitted, was calculated to degrade the defendant in the eyes of the jury, and was incompetent. (*Van Bokkeln v. Berdell,* 130 N. Y. 141.) Improper references to another trial of defendant for murder were made by the district attorney in his summing up. He assumed, in arguing to the jury, that the defendant, although acquitted after a trial, had been guilty of the crime. (*People v. Wolf,* 183 N. Y. 464.)

*William Travers Jerome, District Attorney* (*Robert C. Taylor* of counsel), for respondent. The evidence of the accusations at the hospital was properly received. (*People v. Hughson,* 154 N. Y. 153; *People v. Place,* 157 N. Y. 584; *People v. Greenfield,* 85 N. Y. 85; *People v. O'Neill,* 112 N. Y. 355; *People v. Pierson,* 79 N. Y. 424; *People v. Ogle,* 104 N. Y. 511; *People v. Hope,* 83 N. Y. 418; *People v. Barber,* 115 N. Y. 475; *People v. Coleman,* 55 N. Y. 81; *People v. Murphy,* 135 N. Y. 450; *People v. Shea,* 147 N. Y. 79; *People v. Linsday,* 63 N .Y. 143; *People v. Ryan,* 79 N. Y. 593; *People v. Conroy,* 97 N. Y. 62.) If the defendant could degrade the witness Ruggieri by showing that she was a

12

prostitute, the People were entitled to explain the matter by showing that it was by his procurement. (*People* v. *Buchanan*, 145 N. Y. 1; *People* v. *Barone*, 161 N. Y. 451.) There was no error in the cross-examination of the defendant as to his trouble in Brooklyn. (*Carpenter* v. *Ward*, 30 N. Y. 243; *People* v. *Zigouras*, 163 N. Y. 250.) There was no error in the remarks of the prosecuting attorney or of the trial judge. (*People* v. *Doody*, 172 N. Y. 165; *People* v. *Conklin*, 175 N. Y. 333; *People* v. *Wagner*, 180 N. Y. 58; *People* v. *Smith*, 180 N. Y. 125.)

VANN, J. The defendant and his brother, Dominico Cascone, were jointly indicted for the murder of Tirigi Sinischalchi on the 9th of June, 1903, at the borough of Manhattan, by inflicting a gunshot wound upon him, of which he died ten days later. The defendant was tried and convicted of murder in the first degree, but his brother fled and was never taken. At the time of the homicide the defendant was thirty-seven years old, of large size and great strength, while his brother, aged twenty-eight, was small and weak.

Two persons were shot at the same time and by the same person, Sinischalchi, for whose murder the defendant was tried, and Santanelli, who was killed outright on the same occasion, but his name does not appear in the indictment now before us. The homicides took place at about half-past seven in the evening of June 9th, 1903, in the open street nearly in front of No. 112 Mulberry street in the city of New York. The sidewalk was thronged with people at the time, and there were some in the driveway. There had been ill-feeling between Dominico Cascone and the two men who were killed for a longer or shorter period. When it began does not appear, and the first we learn of the relations of these men, beyond their mere acquaintance, is from one Cibelli, a relative of both Sinischalchi and Santanelli, who testified that on Decoration Day, May 30th, 1903, ten days before the homicide, Dominico had an altercation with

them, and one of them slapped him in the face. He was not injured, but felt the insult keenly, and, going to his brother with tears in his eyes, told him what had occurred. The defendant said: "Well, never mind, when they pass over here, if you don't kill them I will." Four or five days later, Marie Ruggieri, who lived with the defendant, but was not his wife, saw him, as she says, clean and load the gun with which the crime was subsequently committed, and put it away in the house where he lived, No. 112 Mulberry street. On the day before the homicide, as Marie Sinischalchi, a relative of one of the dead men and the lessor of the other, testified, the defendant spoke of the assault upon his brother, and said: "I got a nice two-barreled gun upstairs, and when they pass over here I will fix them." About an hour before the homicide, according to Marie Ruggieri, the defendant said to his brother, "In the evening we will shoot," or, as she put it in English when the interpreter expressed doubt as to her meaning, "You got to kill; you got to kill."

At about half-past seven in the evening, as the two victims were walking together in the middle of the street, nearly opposite No. 112, according to the evidence of six witnesses called by the People, they were shot one right after the other by the defendant with a double-barreled shotgun. Santanelli fell dead, but Sinischalchi lingered for a few days, when he died in a hospital from blood poisoning caused by the wound. The gun was loaded with bullets of coarse shot, one or more of which entered at the angle of the jaw on the right side of the face, carried away part of the jaw, and, passing out at the mouth, perforated the tongue and lower lip. The physician who made the autopsy testified that the deceased must have been shot from behind, or as he was turning around.

The eye-witnesses who thus testified were a brother of Santanelli, the Ruggieri woman and four other Italian witnesses apparently disinterested, including a lad of twelve and a half

years. One of them, when asked to point out the person who did the shooting, did not touch the defendant but another man. According to the theory of the prosecution, supported by some but not all of these witnesses, the defendant after shooting handed the gun to his brother Dominico, who fled with it into the hall of 112 Mulberry street, while the defendant fled diagonally across into the barroom of No. 109. Officer Powers, who was on hand promptly after hearing the shots, seeing the victims lying in the street, asked one Polino who shot them. Polino, who said he did not want to give the man's name, told the officer that the man who did the shooting ran into No. 112 with the gun. The officer at once searched the premises and found the gun on the third floor, with both barrels warm and an exploded cartridge shell in each. This was before the defendant was arrested. Two witnesses testified that they saw Dominico put the gun down where it was found by the officer and then disappear through the roof. He was never seen afterward, so far as the evidence discloses. Polino, who was called by the defense, swore that he heard two shots, only an instant apart and, turning around, saw Dominico with the gun in his hand running into the hallway of No. 112. The defendant was arrested five or ten minutes after the homicide in the saloon at No. 109 Mulberry street, and not long afterward he admitted that he owned the gun, but on the trial he denied it, stating that he owned a gun somewhat like it. He was at once taken by the arresting officer to the Hudson Street Hospital and confronted with Sinischalchi, but what then transpired will be described hereafter.

On the other hand, twelve witnesses, called by the defendant, swore either that they saw Dominico do the shooting, or to facts from which the irresistible inference was that some one other than the defendant fired the shots. These witnesses were all Italians, but the most of them were apparently disinterested and their version was as reasonable and as well supported by cir-

cumstances as that given by the witnesses for the People. They resided or had business in Mulberry street at the time of the homicide and they all testified that the defendant was not the man who shot Sinischalchi. Moreover, thirteen other witnesses, including the defendant testified that he was somewhere else when the homicide took place, and four that at the time Marie Ruggieri swore she heard the two brothers plan the murder on the afternoon of the homicide, the defendant was at No. 82 Bayard street. Twenty-five witnesses, all of the same nationality, testified to a state of facts, which, if true, proved that the defendant did not do the shooting.

The case was clearly for the jury and the evidence warranted them in finding the verdict they rendered. It was for them to settle the remarkable conflict between the witnesses and no court can say on which side the truth really was. While there was a preponderance in numbers for the defendant, the actual weight of evidence, which depends so largely upon appearance and credibility, may have been with the People. There was evidence to support the verdict whether the jury found that the defendant committed the crime himself, or induced his brother to commit it, and aided him by furnishing a loaded gun, for in either event he was guilty of deliberate and premeditated murder. Upon whatever theory they proceeded there was a momentous question of veracity. They may have found that he fired the fatal shot himself and, hence, the perplexing conflict in the evidence upon the question of identity makes it important to see that no injustice was done him at the trial, for in such a peculiar case a feather's weight may have turned the scales against him. The absence of controlling or even significant circumstances to guide the jury through the maze of contradiction and falsehood, may require a new trial for errors which ordinarily could be disregarded with safety.

Kennelly, the arresting officer, took the defendant to the hospital and led him to the operating table upon which Sinis-

chalchi was lying. He was conscious but could not speak, owing to his wound, although he could communicate by motions and in writing. Kennelly asked him if he knew the man who shot him and he nodded his head. He was then asked to write the man's name on a pad that was handed him and he wrote the name of the defendant. The officer read the name in the presence of the defendant, who shrugged his shoulders but said nothing. The paper, marked Exhibit 6, was offered in evidence by the People, when the defendant objected to it as incompetent and irrelevant. The court overruled the objection, saying that the paper was not offered as a dying declaration, no foundation having been laid, but as a statement made in the presence of the defendant, and an exception was taken.

The same evening the officer brought the defendant to the bedside of Sinischalchi and asked him, " Do you know this man ? " and he bowed his head as before. The officer then said, " Put his name on a piece of paper," and the deceased wrote " Raffaele Cascone." The officer " read out " the name and the defendant shrugged his shoulders. This paper, marked Exhibit 4, was read in evidence by the prosecution subject to the same objection but no exception was taken.

The officer, who did not understand Italian, was doubtful whether Sinischalchi comprehended what was said to him, so he called a young Italian named Thomas and through him attempted to ask in that language the question, " Why did he shoot you ? " and Sinischalchi in answer wrote something on a piece of paper handed him for the purpose. Thomas, though present in court, was not sworn. When the officer called the defendant's attention to what was written he shrugged his shoulders. This paper, marked Exhibit 7, was read in evidence subject to objection and exception. Neither the officer nor the official interpreter could translate what was thus written, but when translated by one who understood the peculiar dialect it was said to mean " Because of a quarrel with my brother."

The next morning, by direction of Coroner Brown, the officer brought the defendant before Sinischalchi, when the coroner asked him, " Is this the man who shot you ? " and Sinischalchi nodded his head. The defendant then spoke in Italian to Sinischalchi, who held up two fingers. The defendant said, " See, he means two," and started to speak in Italian, when the officer said, " Don't speak in Italian to him." The defendant stopped ; the coroner said, " Take him away," and he was at once removed. No objection was made or exception taken to anything said or done during this interview.

On his cross-examination the officer, under pressure from the court, testified that when Exhibits 4 and 6 were written and the defendant shrugged his shoulders, he declared his innocence and said, " I don't know anything about it." He also testified that Italians shrug their shoulders when they are undecided and that he did not take such action by the defendant to mean an admission of guilt.

One Torelli swore that after Exhibit 4 was written the defendant asked Sinischalchi if he really said that he, the defendant, was the man who shot him and that Sinischalchi bowed his head. When asked what the defendant then did, the witness answered that he did not remember that he did anything, but he was not asked whether the defendant said anything. No other witness of the four who were present remembered this, and the defendant denied it.

No evidence was given as to what was said to Sinischalchi when Exhibit 7 was written. The lad who asked the questions in Italian, although in court and identified by Officer Kennelly as the one through whom he put them, was not called as a witness. It did not appear that the defendant understood the important question put to Sinischalchi just before he wrote that exhibit.

The defendant could speak English, but not well, for while his direct evidence seems to have been given in that language, on his cross-examination the aid of an interpreter was required.

His testimony as to what took place at the hospital leaves it un-
certain whether he had any clear or adequate understanding of
all that was said there, and, if he is to be believed, he did not at
the time know what Exhibit 7 meant, nor understand the ques-
tion put to Sinischalchi which caused him to write it. Thus,
when asked on his cross-examination, without objection, " Do
you know of any reason why Tirigi Sinischalchi should accuse:
you of shooting him, if it was not true ? " he answered, " Well,;
he think me shoot him, because I have got a place at 112 and he·
got trouble with my brother." Q. " Well, he had trouble with:
your brother, you say ? " A. " No; I think because I see. it
now; I see it now on the paper and the people talk about it.".
Q. " Then on the note you saw that he wrote, ' Had trouble
with his brother,' is that what you saw ? " A. " He signed the·
name; he got a name in there. He write he got trouble with my
brother." Q. " And he wrote on the paper that the reason for·
your shooting him was that he had trouble with your brother ? ".
A. " I don't know nothing about trouble with my brother."
Q. " Then what did you mean by talking about trouble with.
your brother a minute ago ? " A. " Well, the people talk with
me in the prison." Q. " The people thought that your brother
had trouble with Sinischalchi; is that it ? " A. " I ask the,
question if he had any trouble." Q. " Who did you ask the·
question of ? " A. " In the prison, four months and a half
ago. I don't know the people now." Q. " When did you,
first talk about the trouble with your brother that Sinis-
chalchi had ? " A. " I no talk at all about my brother."
Question repeated by interpreter. A. " I never spoke about
that." Q. " What did you mean a minute ago when you
said you talked about trouble with your brother then ? "
A. " The people said so but I didn't know." Q. "Ah!
the people said that your brother had had trouble with
Sinischalchi, did they ? " A. " Yes, in the prison." Q. " And
it was only in the prison that you heard that for the first time ?";

A. " Yes, sir." \* \* \* Q. " Now do you remember the question being asked of the deceased, Tirigi Sinischalchi, ' Why did he shoot you ? ' " A. " There was no question of that kind." Q. " Didn't you hear the officer there ask the question of Tirigi Sinischalchi, referring to you, ' Why did he shoot you ? ' " A. " I don't know anything about it." Q. " I am asking you if you did not hear that man ask of the deceased, referring to you, ' Why did he shoot you ? ' " A. " No, sir. They haven't said anything of this sort at all." Q. " Now don't you remember hearing one of the slips written by Sinischalchi read off and that it stated, ' Had quarrel with brother ? ' " A. " I don't know anything about it. I had no trouble with my brother." He denied that he could read what was written on Exhibit 7 but said that it meant, " He got trouble with my brother." He was then asked, " Now didn't you hear that paper read before you in the hospital after it was written by Sinischalchi," and he answered, " I see when Sinischalchi write that, but what it was I don't know." Q. " Well, didn't they ask you, or repeat to you in Italian ' Because I had trouble with his brother ? ' " A. " No, they don't tell me nothing. I talk with the policeman. He no talk to me. \* \* \* I told the sergeant, ' I no got trouble with nobody.' "

The manifest tendency of the evidence as to what transpired at the hospital was to injure the defendant. While the writings of the deceased were not dying declarations, they were used as such, for the assistant district attorney in summing up spoke as follows: " Do you believe that if as a matter of fact this defendant had not shot and killed, eventually killed Sinischalchi, that Sinischalchi would have said that the defendant did it then and there ? \* \* \* If he had never had trouble with this Sinischalchi, why should Sinischalchi, who had trouble with Dominico and who was anxious to get even, was anxious for revenge, why should not he have put down the name of Dominico Cascone instead of the name of this defendant ? Why was

it each time when he was asked at the hospital, in the presence of Benner and Kennelly and the Italian interpreter, in the presence of Benner, Kennelly and Coroner Brown, why was it on every single occasion when he was asked who did the shooting, that he wrote ' Raffaele Cascone ? ' Why was it when they said, ' Why did he shoot you ? ' that he wrote, ' Had quarrel with brother ? ' Now, there is a fact that you cannot get over, and it goes to corroborate the testimony of the relatives or connections by marriage, because it corroborates every portion of the statements that they have made, touching the fight in the park between Santanelli, Sinischalchi and Dominico Cascone. * * * It is impossible, if you don't get away from it, under the evidence to fail to find a verdict against this defendant, for the reason that Sinischalchi, the moment he was asked who shot him, said it was this defendant. In the presence of this defendant he said it on one occasion. On another occasion he wrote the defendant's name twice. It may be that the preliminary question at the hospital on the first night was ' Do you know this man ? ' and the deceased nodded and the name ' Raffaele Cascone ' was written upon that paper. That was read to the defendant. He was asked ' Who shot you ? ' The second paper was written, ' Raffaele Cascone.' It was written by Sinischalchi and read to this defendant. He was asked, ' Why did he shoot you ? ' ' Because of a quarrel with the brother,' written on the paper and brought to the attention of this defendant, as he admitted himself on his cross-examination. What did he do ? He shrugged his shoulders."

Thus the main argument was founded on these declarations as the testimony of the deceased, with only a slight allusion to their effect upon the defendant, which was their only legitimate function. The dead man was made to testify against the defendant, and no evidence could have been more dangerous. It was argued that he must have spoken the truth and that he could not have been mistaken. It was well calculated to induce the

jury to believe that the witnesses for the prosecution spoke the truth, notwithstanding the large number with the same opportunity to know the facts, who testified the other way. What would the jury be more apt to lay hold of as a test of credibility than the declaration of the victim, himself, made in the face of death? The court did not tell them that they could not use his statements as dying declarations, nor instruct them as to the purpose for which they could be lawfully used. They may have used them to convict the defendant.

It is unnecessary to decide whether the judgment should be reversed, in the absence of exceptions, under the broad power committed to us in the interest of justice in a capital case, because we think it was reversible error, duly raised by exception, to receive Exhibit 7 in evidence, for the reason that what was said in Italian to the deceased, which led him to write what he did, was not shown. Even if the defendant understood what was written, of which there is much doubt, he was not shown to have known what was said that led to the writing. Without that, the writing did not call upon the defendant to say anything, for the question and answer together may not have amounted to any accusation, yet how fatal it may have been when treated as a dying declaration. None of this evidence was admissible except for the single purpose of showing what the defendant did or said when confronted with an accusation. (*People* v. *Kennedy,* 164 N. Y. 456, 15 N. Y. Crim. 247; *People* v. *Smith,* 172 N. Y. 210, 232, 17 N. Y. Crim. 39.

In the *Kennedy* case Judge HAIGHT said: " There are circumstances under which the declarations of persons made in the presence of the accused are competent, but they are regarded as dangerous and should always be received with caution and should not be admitted unless the evidence clearly brings them within the rule. Declarations or statements made in the presence of a party are not received as evidence in themselves, but for the purpose of ascertaining the reply the party to be affected

makes to them.  They are only competent when the person af-
fected hears and fully comprehends the effect of the words
spoken and when he is at full liberty to make answer thereto,
and then only under such circumstances as would justify the in-
ference of assent or acquiescence as to the truth of the statement
by his remaining silent."

And in the *Smith* case Judge MARTIN said: " The only pos-
sible ground upon which the silence of a party can be admitted
as evidence against him, is that it amounts to an acquiescence in
a statement or act of another person.  The rule admitting such
evidence is to be applied with careful discrimination.  Such
evidence is most dangerous and should be received with great
caution, and not admitted unless of statements or acts which
naturally call for contradiction, or unless it consists of some as-
sertion with respect to his rights, in which, by silence, the party
plainly acquiesces.  To have that effect, his acquiescence must
be exhibited by some act of voluntary demeanor or conduct.  If
the claimed acquiescence is in the conduct or language of an-
other, it must plainly appear that such conduct or language was
fully known and fully understood by the party before any in-
ference can be drawn from his passiveness or silence.  The cir-
cumstances must not only be such as to afford him an oppor-
tunity to act or speak, but such as would ordinarily and
naturally call for some action or reply from persons similarly
situated."

The writing in question does not come within the rule thus
laid down by this court.  It did not appear that the defendant
understood the question to which the writing was an answer,
whereas the rule requires that it should have been " fully known
and fully understood by him."  He did not " hear and fully
comprehend the effect of the words spoken," and hence the
written answer to those words, even if understood by him, was
incompetent for any purpose.  This error was raised by ob-
jection and exception, but another, almost as serious, although

not thus raised, was committed during the interview with Coroner Brown. After Sinischalchi had nodded his head in response to the question, " Is this the man who shot you ? " the defendant said, in English, " See, he means two," and then started to speak in Italian, but was told not to, and hurried away. This was a violation of the rule, the sole purpose of which is to learn the answer of the defendant to an actual or implied accusation. The evidence is utterly incompetent, when the accused is deprived of the right to answer the charge made. For aught that appears the defendant was about to declare he was innocent, as he did the day before, when stopped by the officer in charge. (*People* v. *Koerner*, 154 N. Y. 355, 374, 12 N. Y. Crim. 503.)

Marie Ruggieri was an important and willing witness for the prosecution, as the record plainly shows. On her cross-examination she testified that she did not know where one Carmela Nappi lived, but said that at the time of the homicide she was living with herself. She was then asked, " Did Carmela live in your rooms at that time ? " and she answered, " Yes, sir; we were living there both, and were compelled to be harlots by Raffaele Cascone. Raffaele Cascone lived at 112 and 110½." The mischievous part of the answer was not responsive to the question, but the defendant's counsel took no notice of it at the time, for the reason, as he explained afterward, that he did not hear the statement. On the re-direct examination the assistant district attorney asked a question in line with the statement volunteered by the witness, which caused discussion, and the court struck out the answer above quoted. This cleared the record for the time being, but the assistant district attorney was not satisfied, for he at once asked, " When you came over to this country who did you come with ? " and, without objection, the witness answered, " With Raffaele Cascone." She was then asked, " Did he bring anybody else with you ? " This was objected to, the objection was overruled and an exception taken,

when she answered, " Carmela Nappi." She was next asked, " Where did Raffaele Cascone take you when he brought you to America ? " This was allowed as before, under objection and exception, and the witness answered, " 112 Mulberry Street." This question followed: " Where did he take Carmela Nappi ? " Subject to objection and exception, she answered, " Together with me." The examination was then continued without further objection as follows: " Now, when you came here to New York in 1902, in July, you went to 112 Mulberry Street, did you ? You were taken there by the defendant ? " A. " Yes, sir. While we were living there at 112 and 110½ Mulberry Street he caused us to be harlots." Q. " Who is he ? " A. " Raffaele Cascone." Q. " Who supported you during this time ? " A. " Raffaele Cascone." Q. " Who got the money ? " This was objected to and withdrawn, when the defendant's counsel moved to strike out the evidence and that the jury should be instructed to disregard it, but the motion was denied and an exception taken. Thereupon the trial justice, himself, asked the following questions: Q. " Do I understand you to say that you lived as a harlot at 110¼ Mulberry Street ? " A. " Yes, sir." Q. " And received men promiscuously, received different men ? " A. " I do not know, twenty or thirty, what can I say ? " Q. " Did they pay you ? " A. " No, sir. They paid the wife of Raffaele Cascone." These questions were not objected to, perhaps because they were asked by the court.

Thus on the trial of a man for murder, evidence was received to show that he made harlots of women and that his wife received the proceeds of their infamy. The trial justice appreciated that it was improper, at first, for he struck out the evidence once, but received it again, some of it, but not the worst, under objection and exception. He denied the motion made to strike out that which was received the second time, and allowed an exception. He then asked the most incompetent

questions of all, himself, but no objection was made. The exceptions that were taken, however, raise reversible error.

The evidence objected to, when considered in the light of that which had just been struck out as well as in the light of that which immediately followed, tended to prove that the defendant was a pander, living on the filthy wages of women whom he had corrupted. It was intended to degrade him in the eyes of the jury, and if believed by them, must have had that effect. To the average mind, a male bawd is the most despicable creature that degraded nature has yet produced, and this the defendant, with the sanction of the court, was shown to be, although it was utterly irrelevant to any issue upon trial.

It is claimed that this evidence was competent because the defendant had shown on the cross-examination of the witness that she was then living in meretricious relations with a barber in Paterson, New Jersey. This was competent to affect her credibility, but how could her credibility be bolstered up by showing that the defendant was as bad or worse than she was? Does the pot grow white by calling the kettle black? The defendant was on trial for murder, not for keeping a house of prostitution. His credibility was not in issue at the time this evidence was received and in no event could it be attacked by independent proof that he was guilty of some other offense, for that could be shown only by his own admission on cross-examination or by the record of conviction. The door was not opened to admit the evidence in question, the apparent purpose and natural effect of which was to prejudice the defendant before the jury by a method not warranted by law.

When the defendant was on the stand he denied that he had said to Marie Sinischalchi, as she testified, that he had a nice two-barrelled gun upstairs and when they, referring to the two dead men, came over, he would fix them. He then testified that it was a couple of years since he had met her and while he did not then have a quarrel with her, he had had a quarrel with her

husband about four years before.  In order to fix the date, his counsel then asked him, " You had some trouble in Brooklyn about two or three years ago ? "  To which he answered, " Yes, four years and a few months."  Q.  " And you met during that trouble the husband of Marie Sinischalchi, is that right ? "  A. " Well, I see him that time and I don't talk to him."

It is claimed that this opened the door to the district attorney and permitted him to ask the following questions with which he began his cross-examination : Q.  " The trouble that your counsel referred to that you had in Brooklyn, was an indictment for murder in the first degree, for killing two men was it not ? "  A. " I kill nobody."  Q.  " I say the trouble that your counsel referred to, that you had in Brooklyn, I repeat, was a trial for murder in the first degree, for killing two men was it not ? " A.  " No, sir."  Q.  " Weren't you tried for killing two men in Brooklyn ? "  A.  " I was arrested, of course, but I had no trouble."  Q.  " Weren't you tried for killing two men, for murder in the first degree ? "  A.  " Well I no remember that." Q.  " Were you tried for that ? "  A.  " I was arrested, yes." Q.  " And you were tried.  You were put on trial, weren't you ? You had a trial ? "  A.  " Yes."  Q.  " And you had thirty-five witnesses for the defense didn't you ? "  A.  " No, sir."  Q. " How many did you have ? "  A.  " I no remember."  Q. " About thirty-five ? "  A.  " No, sir, I got twelve, or thirteen, or fourteen."  Q.  " Thirty or forty ? "  A.  " Twelve or thirteen, or fourteen, I don't know."  Q.  " And don't you recollect that at the trial your pistol was found with three loaded cartridges and two exploded cartridges ? "  At last the defendant's counsel objected and the court sustained the objection.

The learned trial assistant did not forget this evidence when he came to address the jury, for in the course of his remarks, after contending that certain evidence was not true, he said: " If it was not true, why was it introduced ?  Why, to enable this defendant to escape the result of his own unlawful act, to

enable the defendant to escape, shall I say again, in a case where murder is charged?" Alluding to the defendant he spoke of him as " This person who, as you see, was supported by women, this person who you see has been able to bring here a horde of witnesses, and who, therefore, was to a certain extent perhaps a notable man in Mulberry street. * * * How many more casualties do you suppose would occur if this defendant should go free? The trouble in Brooklyn would be repeated, perhaps."

The defendant in an action either civil or criminal, cannot be asked on cross-examination whether he has been indicted, for an indictment is merely an accusation and no evidence of guilt. (*Van Bokkelen* v. *Bardell,* 130 N. Y. 141, 145; *People* v. *Crapo,* 76 N. Y. 288, 290.) He cannot be asked if he was tried for a crime, unless it appears that he was convicted, because a trial followed by acquittal is but an accusation successfully met. A conviction for crime may be proved, or, on cross-examination, actual guilt without a conviction, for either implies moral obliquity, and, hence, affects credibility. A trial which resulted in an acquittal, however, does not tend to discredit a witness and is incompetent for that purpose.

We need not decide whether the door was opened by the defendant's counsel so as to admit the suggestive evidence, or if opened at all whether it was opened wide enough to admit all the injurious details that were received, for the absence of an objection and exception on this, as well as on too many other occasions during the trial, left the error, if such it was under the circumstances, without legal force, except as a basis for the exercise of our discretionary power.

Other errors were committed, the most of which were not excepted to, some harmless and some not, but as they were such as will not be apt to be repeated upon another trial, we pass them by.

We close our review with the remark, made as a deliberate

remonstrance against the necessity for frequent reversals in criminal cases, that too many prosecuting officers run dangerous, foolish and unprofessional risks in order to secure a conviction. This observation does not apply to the learned assistant who argued this appeal for the People, as he took no part in the trial.

The judgment of conviction should be reversed and a new trial ordered.

CULLEN, Ch. J. (dissenting). While I do not take issue with my brother VANN in the position that some of the rulings of the trial court pointed out by him were erroneous, I am of opinion that in the light of the clear and positive evidence of the defendant's guilt those errors did not affect his substantial rights, and, therefore, under section 542 of the Code of Criminal Procedure, should be disregarded. I join, however, with my brother in reprehending the manner in which important criminal prosecutions are so frequently conducted at this time, often evincing either ignorance of the ordinary rules of evidence or disregard for the interest of both the People and the defendant, which alike require that a trial should be had according to law:

O'BRIEN, WERNER, WILLARD BARTLETT and HISCOCK, JJ., concur with VANN, J.; CULLEN, Ch. J., dissents in memorandum; HAIGHT, J., dissents.

Judgment reversed, etc.