## COURT OF APPEALS,

### Jan. 10, 1911.

# THE PEOPLE v. GEORGE CONROW.

### (200 N. Y. 356.)

(1.) MURDER—EVIDENCE—GOOD CHARACTER OF ACCUSED.

When a person, who is charged with crime, has previously borne a good character, that fact should in every case be considered by the jury with the other evidence in determining whether he is guilty or innocent. The improbability of a person of such character being guilty may of itself be sufficient in any case to raise a reasonable doubt of guilt. When evidence of good character raises a reasonable doubt as to the guilt of a person accused of crime, he is entitled to an acquittal although without such evidence no doubt as to his guilt would exist. If, however, after considering the evidence of good character with all of the other evidence in the case, the jury believe the defendant guilty, they must so find notwithstanding his good character.

(2.) SAME—WEIGHT TO BE GIVEN TO SUCH EVIDENCE—ERRONEOUS REFUSAL TO CHARGE.

Where there is uncontradicted evidence of the previous good character of a defendant charged with the crime of murder, it is reversible error for the court to refuse to charge a request stating, in substance, that, in the exercise of sound judgment, the jury might give defendant the benefit of the presumption of innocence that arises from good character, no matter how conclusive the other evidence might be.

(3.) SAME—DECLARATIONS OF ANOTHER WHEN MADE IN PRESENCE OF PERSON ACCUSED.

There are circumstances in which the declarations of persons made in the presence of the accused are competent, but they are regarded as dangerous and should always be received with caution and should not be admitted unless the evidence clearly brings them within the rule. Declarations or statements made in the presence of a party are not received as evidence in themselves but for the purpose of ascertaining the reply the party to be affected makes to them. They are only competent when the

person affected hears and fully comprehends the effect of the words spoken, and when he is at full liberty to make answer thereto, and then only under such circumstances as would justify the inference of assent or acquiescence as to the truth of the statement by his remaining silent.

!(4.) SAME—WHEN ERRONEOUS RECEPTION OF ALLEGED ADMISSIONS OF ACCUSED NOT CURED BY SUBSEQUENT ORDER STRIKING OUT SUCH EVIDENCE.

Where incompetent or immaterial facts or statements, erroneously received in evidence, are subsequently stricken from the record and the jury is directed by the court not to consider such evidence, such error may, in most cases, be deemed unimportant or cured, and, hence, may be disregarded upon appeal. But if, in a capital case, in which the defendant's life is involved, the evidence, erroneously received, is calculated to affect the jury in determining the guilt or innocence of the defendant notwithstanding it was, at least in form, removed from its consideration, this court has the power and it is its duty to give the defendant a new trial.

(5.) SAME.

It is reversible error for the trial court to permit the district attorney, upon the cross-examination of a defendant indicted for murder with another, who had been tried and convicted, to quote in detail incriminating statements and assertions made in the presence of defendant by such accomplice, and then ask defendant whether such statements were made and whether he had refused to reply thereto, when it was not shown that the defendant was placed in a position where, by reason of his silence, he should be charged with assent or acquiescence in the truth of the statements and charges made in his presence by the accomplice. Such error is not cured because the court, subsequently and at the close of the testimony, granted a motion previously made by defendant's counsel, and struck out such testimony.

APPEAL from a judgment of the Supreme Court rendered July 6, 1909, at a Trial Term for the county of Dutchess upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*James G. Meyer* and *Daniel A. Dugan* for appellant. The court erred in its charge to the jury as to the weight which should be given to the evidence of good character. (*Remsen v. People,* 43 N. Y. 6; *People v. Bonier,* 179 N. Y. 315; *People v. Weiss,* 129 App. Div. 671; *People v. Friedland,* 2 App. Div. 332; *People v. Elliot,* 163 N. Y. 11; *Cancemi v. People,* 16 N. Y. 501; *People v. Gilbert,* 199 N. Y. 10.) The court erred in allowing to be read the statements of Monat to Conrow in the jail. (*People v. Cory,* 157 N. Y. 332; *People v. Fielding,* 158 N. Y. 542; *People v. Fitzgerald,* 156 N. Y. 262; *People v. McLaughlin,* 150 N. Y. 386; *People v. Greenwall,* 108 N. Y. 301; *People v. Sharp,* 107 N. Y. 427.)

*John E. Mack, District Attorney,* for respondent. There was no error in the charge on the question of good character. (*People v. Sweeney,* 133 N. Y. 611; *People v. Dippold,* 30 App. Div. 62; *Cancemi v. People,* 16 N. Y. 501; *People v. Bonier,* 179 N. Y. 315; *People v. Pekarz,* 185 N. Y. 470; *People v. Elliot,* 163 N. Y. 11; *People v. Benham,* 160 N. Y. 402.)

CHASE, J.:

John Kliff and his wife for several years maintained a restaurant principally for railroad employees at Hopewell Junction, in the county of Dutchess. They accumulated several hundred dollars in cash which they retained in their personal possession at the restaurant. Early Sunday morning, January 24, 1907, Mr. Kliff was struck upon his head with some instrument which crushed his skull, from the effects of which he died that day. Mrs. Kliff was also struck by the same or a similar instrument and her skull was crushed but she survived, although she was physically unable to be present at the trial. The money, amounting to about $525,

was stolen. One Napoleon Monat and the defendant were subsequently indicted for the homicide, and charged with murder in the first degree. The theory of the prosecution is, that Monat and the defendant having ascertained that Kliff and his wife had in their possession several hundred dollars in cash, entered into an agreement to rob them, and that pursuant to such agreement and carrying out the details thereof Monat took an iron bolt and entered the restaurant about four o'clock in the morning while the defendant watched outside, and that Monat struck the blows which we have mentioned and took the money, which he divided with the defendant in accordance with said agreement. The defendant denies all participation or knowledge of the crime, but admits that several days thereafter he received a part of the money obtained by Monat from the Kliffs, and that after he had spent part of the money so received he was told by Monat about the robbery and the homicide. They were separately tried upon the indictment and each has been convicted of murder in the first degree.

It is unnecessary to repeat the details of the crime and the evidence connecting the defendant therewith. We have carefully examined the record and are of the opinion that the verdict of the jury should not bet set aside as against the evidence.

The defendant's counsel urges many objections to the judgment being affirmed. One of the reasons why he claims that the judgment should be reversed is for alleged errors of the court in charging the jury upon the subject of good character, and the consideration to be given to it by the jury in determining the guilt or innocence of the defendant.

The defendant produced several witnesses who testified to his good character and no witnesses were produced on behalf of the prosecution to contradict them. The court in the charge to the jury said: " Witnesses have testified on the

part of the defendant to his former good character, witnesses who knew him six or seven or eight years ago, and other witnesses who have known him more recently. And evidence of previous good character is always proper, and is always to be considered by the jury along with the other evidence in a criminal case, and where the questions of fact are sharply contested and the case is close, evidence of good character may of itself create a reasonable doubt as to the defendant's guilt, so the courts have held. But where the evidence satisfactorily establishes the guilt of the defendant beyond a reasonable doubt, where you are satisfied beyond a reasonable doubt that the crime has been made out, then the evidence of previous good character is of no avail to save a man from the consequences of his act. In other words, a man cannot commit his first crime and then come into court and ask to be excused because up to that time he has always lived an exemplary life. Evidence of good character is only to be considered as it may bear upon the question of his credibility and as it may tend to create a reasonable doubt in your minds on the question of his guilt."

At the close of the charge counsel for the defendant said: " I except to that part of your honor's charge which says that where the evidence is close good character may be considered." The court replied to the counsel for the defendant as follows: " I did not say that. I said that it should be considered in any case, and that where the case was close it might of itself create a reasonable doubt."

Alternate statements by counsel for the defendant and the court followed, of which the following is a copy: " Mr. Meyer: I ask your honor to charge further that there is testimony in this case and if the jury believes the testimony of these witnesses upon the subject of the defendant's character that that is proof conclusive of the defendant's good character. The Court: I will leave it to the jury to say what effect the

testimony of those witnesses as to good character is to have. I said to you, gentlemen, and I say again, that evidence of good character is always to be considered in a criminal case along with the other evidence, but if the other evidence convinces you beyond a reasonable doubt of the guilt of the defendant, then the evidence of good character is of no avail. But if the case is close upon the evidence, evidence of previous good character may of itself create a reasonable doubt as to his guilt. Mr. Meyer: I except to your honor's refusal to charge as requested and also to the charge as made. * * * Mr. Meyer: I ask the court to charge the jury that the jury may in exercise of sound judgment give the defendant the benefit of good character no matter how conclusive the other testimony may appear to be. The Court: You are to consider the evidence given by the witnesses as to his previous good character, giving to each such effect as you think under the circumstances it. deserves or ought to have. [Exception to Mr. Meyer.] ".

When a person who is charged with crime has previously born a good character, that fact should in every case be considered by the jury with the other evidence in determining whether he is guilty or innocent. The improbability of a person of such character being guilty may of itself be sufficient in any case to raise a reasonable doubt of guilt. When evidence of good character raises a reasonable doubt as to the guilt of a person accused of crime, he is entitled to an acquittal although without such evidence no doubt as to his guilt would exist. If, however, after considering the evidence of good character with all of the other evidence in the case the jury believe the defendant guilty, they must so find notwithstanding his good character.

This court has had occasion many times to state the rules applicable to the consideration by a jury of the good character of an accused in a criminal case, and a reference to some

of the statements of this court in its reported opinions will be made in place of a general·discussion of the subject.

In *People* v. *Gilbert* (199 N. Y. 10, 26) the court with its approval of the statements made a summary from the charge of the court at the Trial Term as follows: " The jury were instructed to consider the evidence of good character with all the other evidence in arriving at a conclusion; to weigh the probabilities as to whether a person of such character would be guilty of such an offense; that good character alone might create a reasonable doubt, and that if they had a reasonable doubt the defendant was entitled to an acquittal. They were told in effect that good character was not a specific defense, such as justification or excuse might be, but, as it might create a reasonable doubt, even if the evidence were otherwise conclusive, the jury should consider it with all the other evidence in order to decide whether the defendant was guilty beyond a reasonable doubt."

In *People* v. *Bonier* (179 N. Y. 315, 18 N. Y. Crim. 516) this court quoted from the opinions in three important prior cases in this court involving the subject of the previous good character of a person accused of crime, namely, *Cancemi* v. *People* (16 N. Y. 501, 506); *Remsen* v. *People* (43 N. Y. 6); *People* v. *Elliott* (163 N. Y. 11), and then said: " It is, therefore, the law that evidence of good character may of itself create a reasonable doubt, when without it none would exist, and that upon the request of the accused the jury should be told that such evidence, in the exercise of their sound judgment, may be sufficient to warrant an acquittal, even if the rest of the evidence should otherwise appear conclusive." (p. 321.)   In this case the trial court in substance charged the jury that they were limited in the consideration of the previous good character of an accused to a case where the questions of fact affecting his guilt or innocence were closely or nearly evenly balanced, and that good character should not create a

reasonable doubt as to the defendant's guilt unless otherwise the evidence was nearly balanced.

The defendant was entitled to have the jury charged substantially as requested by his counsel, that in the exercise of sound judgment they might give the defendant the benefit of the presumption of innocence that arises from good character, no matter how conclusive the other testimony appeared to be.

The defendant's counsel also claims that the judgment should be reversed because of alleged errors committed by the trial court in allowing the district attorney to detail, in questions put to the defendant, certain statements made by Monat in the defendant's presence while they were both in the county jail. The statements in part will appear more fully hereafter.

The defendant was a witness in his own behalf. When he was being cross-examined he was asked in regard to an interview at the jail, at which Monat, the district attorney, a stenographer and one or more others were present with the defendant. The following is taken from the record of such cross-examination: " Q. Do you remember having a talk with Monat in the county jail in the presence of Mr. Young and myself and stenographer ? A. I didn't have a talk with him. I didn't say anything. Q. Do you remember Monat talking with you ? A I remember him talking to you people, yes. Q. Do you remember him talking with you ? A. I was there when he was talking."

The defendant's counsel objected to what Monat said as incompetent, irrelevant and illegal. The objection was overruled and an exception was taken by the defendant's counsel and the court said: " It depends on what answers the defendant made if any; and if he made none it will be for the jury to say whether his silence under the circumstances amounted to an acquiescence." The defendant's counsel then said: " That is what I object to." The objection was again overruled and an exception was taken by the defendant's counsel.

The district attorney then proceeded: " Q. Did Monat say
this to you: ' Well, George, I understand here this morning
that you turned State's evidence against me, so I thought I
would request Mr. Mack to call you in, and you and I have a
little talk about this murder. Of course you know the posi-
tion I'm in, and you know the details as well as I do. Of
course things is brought in now between you and I, and these
in the room here, for you and I, to talk together. Now, of
course, if you want to talk to me, as I told Mr. Mack and Mr.
Young and these people, why I would like to have you tell
me who made the certain remarks, or one or two things, and
one of them was, that you didn't know anything about the
job until you got to New Haven and I gave you $250 to keep
your mouth shut. Now you know me, George, and I know
you, and you know the position I'm in. I know what's going
to become of me, but all I want is that you must take a little
of this blame and not put it all on me, because there is noth-
ing can save me; I did the deed, and you was just as deep in
it as I was and you know everything that was done, from the
beginning to the end. You know where you and I went,
and everything, and you can just as well go on and tell your
share of what you done, and everything. No matter what
you tell any one else, it ain't going to save me. I committed
the murder from our planning, you and I, and that settled
it. Of course, when I heard you made the remark when I
met you at New Haven I gave you $250 at New Haven to
keep your mouth shut you know that ain't right, don't you?'
To which you answered: ' I've got nothing to say; I don't
answer no questions. Where's my attorney?' Is that right?
A. No, sir; it is not. Q. What is wrong? A. When I
come in there didn't I say to you I would answer no questions
whatever under instructions of my attorney. Q. Did you
answer Monat's question, 'I have nothing to say?' A. I
said I wouldn't answer no questions. Q. Didn't you say, ' I

have nothing to say?' A. No, sir. Q. Did he ask you this question, 'Now, George, to bring on one thing and the other, when we first started, the first thing was about the expressman; that is how we first started in about the money racket?' Mr. Meyer: I object to bringing in a collateral matter. The Court: Repeat it. Q. Did Monat ask this question and did you make the following answer to it, 'Now, George, to bring on one thing and the other, when we first started the first thing was about the expressman; that is how we first started in about the money racket; we tried it on the expressman three nights running and never succeeded, by your not being where you were requested to be, and then Bock's came; of course, we got Baker's money without any fear of anything in Baker's place, and you got six dollars of it and I got $6.10; it was $12.10 altogether. Am I right or am I wrong? And the ladder was taken away that night, and you was with me, and you know where I put the ladder, and we took it down and put it back, and then we went to the caboose. I think we made one or two trips before the Kliff affair came up. You and I made the plan and planned it well, and you and I called it, and we had McGough call us, you remember, that night I told them I would go out on the pusher at three o'clock, and if I didn't go out we told McGough to wake us anyway and we would take the roustabout, and McGough came down and waked us up, and we went down altogether and he went up in the new yard, and you and I went up about our business, and we went up and had the little talk about what you and I was going to do; you was to stay on the crossing and I was to go in and buy whatever I was to buy and hit Mr. Kliff, and no matter who came there you was to back me up, and you didn't back me up, George, and after I went in you went over to the dispatcher's office, and when I got through in there I whistled for you and you came out after I whistled three times, and I asked you who was knocking at the door, and you said there was no one, you said you were there all

the time, which you wasn't.   You know as well as I do, George, that that night, that you stood on the crossing just about long enough for me to get inside and you to get out where you was. There is one man there who said you talked to him, a few words maybe, and you went in the inside and stayed there, and the fireman came and knocked at the door, and ·when I whistled you came out, and you asked me if I had the money and I told you ' yes,' and I asked you if you had stayed there, and you said ' yes ' until just when I come out, and we went down in the caboose and divided the money, and in the morning Stearns went out and looked it over, and you and I went up and you got your bills at 11:15 and we went to Summit and I left you at Waterbury; and you had the money when I left you at Waterbury, didn't you?

" ' I went to New Haven and got a room at a hotel and waited for you to come down there and you didn't show up until Tuesday night and we spent the money there.   Of course I don't know what you did with all of yours and finally you bought some medicine and filled three or four prescriptions for me, if I am right, and we drank and we had quite a good time down there with it, and when I left you to go home, I told you just what I was going to do, I was going to write you, and I did, and just as soon as I got home I wrote to you, but I don't know whether you have the letter or not, and the next thing I knew the officers come down to the house and got me.

" ' About Kliff, the first way it started, we started with the expressman, and going up to Baker's.   If I go wrong on the details I want you to stop me, George.   When you sprung that about Kliff and the money that night, I don't remember whether it was a night or two before, and I asked you how you knew that Kliff had money, and you told me.   Am I right or wrong?   To which you answered: ' I won't say.' ' "

The defendant's counsel moved that the question be stricken from the record on the ground that the defendant was acting

on the advice of his counsel and had a right to refuse to answer, and on the further ground that the question is asked for the purpose of getting before the jury statements which cannot be gotten before them in any other way. The motion was denied and the defendant's counsel excepted.

The district attorney then proceeded as follows: " Q. Was that question asked you by Monat and did you make that answer? A. No, sir; I made no answer. By the Court: Q. Was that statement made by Monat in your presence and did you say in reply and in answer to him, ' I won't say? ' A. No, sir. I told them when I went in I wouldn't answer no questions under the instruction of my counsel. Q. Did you make this statement that Mr. Mack has just read? A. Yes, sir. By Mr. Mack: Q. Did Monat ask you this further question: ' You said you had seen her counting it out, and I told you I didn't believe it, and we went up there at night and I watched and seen it. Yes, I saw her count the money, and he asked me if I saw her, and I said yes, and that night I came ahead of you on 17–4 out of Waterbury, and I met you there in Hopewell and that morning we came right up after he woke us up and I got the bolt out of the barrel and I was supposed to put them unconscious, which I didn't; I had to strike him the second blow to put him down, and that killed him, and also I had to hit Mrs. Kliff, and I went in and got the money, and I also got the money in the little drawer; you said in the statement to me that there was two drawers, one on top and one near it, about half and half drawers as you would call them, and after we had got back to the caboose we counted it and divided it and everything. You made the plants, George. You know as well as I do, if you wanted to talk you could talk.' * * * "

The district attorney added to the last question from which we have quoted further statements of the same general character as those quoted, which added statements equal in number and extent all of the alleged statements of Monat quoted above

but they are omitted to avoid unreasonably extending this opinion.

After the question to the defendant from which we have quoted in part had been completed the record is as follows: " By the court, Q. Did he make that statement ? A. Yes. Q. Did you refuse to make any reply ? A. Yes, sir." A motion was then made to strike from the record all of such questions and answers relating to Monat's statements, and the court said: " I will reserve my decision upon your motion until some time later during the trial. He certainly had a right to refuse to answer, and whether his silence under the circumstances could be used against him or construed as consent or acquiescence I am not certain about; I will consider it and rule later."

At the close of the testimony upon motion the court struck out the testimony, and said to the jury that the defendant's silence " cannot be regarded as an admission on his part, because he was strictly within his legal rights when he said I won't say anything by advice of counsel. Of course, if he had been in a position where he ought to have admitted or denied, then his silence would have acted against him, but inasmuch as he was acting on the advice of counsel and refused to answer or speak, for that reason I do not think his silence can be used against him."

The district attorney did not at any time show that the defendant was placed in a position where by reason of his silence he should be charged with assent to or acquiescence in the truth of the statements and charges made in his presence by Monat. There are circumstances in which the declarations of persons made in the presence of an accused are competent, but they are regarded as dangerous and should always be received with caution and should not be admitted unless the evidence clearly brings them within the rule. Declarations or statements made in the presence of a party are not received as evidence in them-

.selves but for the purpose of ascertaining the reply the party to be affected makes to them. They are only competent when the person affected hears and fully comprehends the effect of the words spoken, and when he is at full liberty to make answer thereto, and then only under such circumstances as would justify the inference of assent or acquiescence as to the truth of the statement by his remaining silent. (*People* v. *Kennedy,* 164 N. Y. 456; *People* v. *Smith,* 172 N. Y. 210; *People* v. *Cascone,* 185 N. Y. 317; 20 N. Y. Crim. 175.)

The rulings of the court in allowing the district attorney to make such statements and charges against the defendant in the form of questions were clearly erroneous and tended to injure the defendant seriously. The final ruling of the court was right and such reversal of the former ruling was made as clear and comprehensive as it was possible to make it. As a matter of law the statements and charges were no longer a part of the record. The previous erroneous rulings were theoretically cured and the statements and charges eliminated from the minds of the jury. Whether in practical result it is possible to remove from the minds of jurymen the effect of such detailed statements and charges when so deliberately received and repeated in their hearing may well be doubted. Where the judgment is death the jurisdiction of this court is not limited to the review of questions of law. (Constitution, article 6, sec. 9.) If the dramatic recounting of the alleged acts and sayings of the defendant was calculated to affect the jury in determining the guilt or innocence of the defendant, notwithstanding that they were at least in form removed from its consideration, we have the power and it is our duty to give the defendant a new trial for that reason.

In the trial of cases it frequently occurs that incompetent or immaterial facts or statements get before the jury inadvertently or without having been given that careful thought which they should have had. In such case even where the evidence

is received subject to objection and exception, if it is subsequently stricken from the record and the jury is directed by the court not to consider it, the error may in most cases be deemed unimportant, or cured, and it is generally disregarded upon appeal.

In this case it appeared before any of the statements and charges were repeated by the district attorney that the defendant had intentionally and deliberately refused to make any reply to them when they were made by Monat, and before any considerable part of the statements and charges had been detailed on the trial it further appeared that the defendant had been advised by his counsel not to reply to statements made to him, and that at the time they were made by Monat he did not reply because he was obeying such advice of his counsel; and yet the district attorney persisted in asking the questions and the court deliberately allowed him to proceed with great detail to recount before the jury Monat's statements and charges, not only as they related to the robbery and homicide of Kliff, but as to other alleged distinct and independent crimes. It is difficult to conceive of anything more damaging to the defendant. At the time these questions were asked of the defendant Monat had already been a witness for the prosecution and he had so far as appears narrated every material and competent fact within his knowledge relating to the crime and connecting the defendant therewith.

The statements and charges of Monat must have been repeated to the jury for the express purpose of influencing it in its deliberations upon the question of the defendant's guilt.

It is not always an easy thing for a juryman to eliminate from his memory the effect of damaging statements made in his presence. (*Brooks* v. *Rochester Ry. Co.,* 156 N. Y. 244; *People* v. *Corey,* 157 N. Y. 332; *People* v. *Fielding,* 158 N. Y. 542.) In this case where the defendant's life is involved, we are unwilling to take the responsibility of saying

that the statements and charges of Monat erroneously received, although stricken out, did not affect the result.

It is unfortunate that incompetent testimony, even when peculiarly calculated to materially influence a jury, is so frequently urged upon its attention in criminal cases when slight care given to its consideration would not only reveal its incompetency but the danger and wrong of persisting in its consideration.

For the reasons stated the judgment of conviction should be reversed and a new trial ordered.

CULLEN, Ch. J., GRAY, WERNER, WILLARD BARTLETT, HISCOCK and COLLIN, JJ., concur.

Judgment of conviction reversed, etc.